# ERZNOZNIK *v.* CITY OF JACKSONVILLE

No. 73–1942.  Argued February 26, 1975—Decided June 23, 1975

*William H. Maness* argued the cause and filed a brief for appellant.

*William Lee Allen* argued the cause for appellee. With him on the brief was *Harry Louis Shorstein.*\*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents a challenge to the facial validity of a Jacksonville, Fla., ordinance that prohibits showing films containing nudity by a drive-in movie theater when its screen is visible from a public street or place.

I

Appellant, Richard Erznoznik, is the manager of the University Drive-In Theatre in Jacksonville. On March 13, 1972, he was charged with violating § 330.313 of the municipal code for exhibiting a motion picture, visible from public streets, in which "female buttocks and bare breasts were shown." [1] The ordinance, adopted January 14, 1972, provides:

> "330.313 *Drive-In Theaters, Films Visible From Public Streets or Public Places.* It shall be unlawful and it is hereby declared a public nuisance for any ticket seller, ticket taker, usher, motion picture projection machine operator, manager, owner, or any

---

\*Briefs of *amici curiae* urging reversal were filed by *James Bouras* for the Motion Picture Association of America, Inc., and by *Irwin Karp* for the Authors League of America, Inc.

[1] The movie, "Class of '74," had been rated "R" by the Motion Picture Association of America. An "R" rating indicates that youths may be admitted only when accompanied by a parent or guardian. See generally Friedman, The Motion Picture Rating System of 1968: A Constitutional Analysis of Self-Regulation by the Film Industry, 73 Col. L. Rev. 185 (1973). Although there is nothing in the record regarding the content of the movie, the parties agree that it includes pictures of uncovered female breasts and buttocks.

other person connected with or employed by any drive-in theater in the City to exhibit, or aid or assist in exhibiting, any motion picture, slide, or other exhibit in which the human male or female bare buttocks, human female bare breasts, or human bare pubic areas are shown, if such motion picture, slide, or other exhibit is visible from any public street or public place. Violation of this section shall be punishable as a Class C offense."

Appellant, with the consent of the city prosecutor, successfully moved to stay his prosecution so that the validity of the ordinance could be tested in a separate declaratory action. In that action appellee, the city of Jacksonville, introduced evidence showing that the screen of appellant's theater is visible from two adjacent public streets and a nearby church parking lot. There was also testimony indicating that people had been observed watching films while sitting outside the theater in parked cars and in the grass.

The trial court upheld the ordinance as a legitimate exercise of the municipality's police power, and ruled that it did not infringe upon appellant's First Amendment rights. The District Court of Appeal, First District of Florida, affirmed, 288 So. 2d 260 (1974), relying exclusively on *Chemline, Inc.* v. *City of Grand Prairie,* 364 F. 2d 721 (CA5 1966), which had sustained a similar ordinance.[2] The Florida Supreme Court denied certiorari, three judges dissenting. 294 So. 2d 93 (1974). We noted probable jurisdiction,[3] 419 U. S. 822 (1974), and now reverse.

---

[2] The only other United States Court of Appeals to consider this question reached a contrary result. See *Cinecom Theaters Midwest States, Inc.* v. *City of Fort Wayne,* 473 F. 2d 1297 (CA7 1973).

[3] A local ordinance is deemed a state statute for purposes of invoking this Court's jurisdiction under 28 U. S. C. § 1257 (2). See *King Mfg. Co.* v. *City Council of Augusta,* 277 U. S. 100 (1928).

## II

Appellee concedes that its ordinance sweeps far beyond the permissible restraints on obscenity, see *Miller* v. *California,* 413 U. S. 15 (1973), and thus applies to films that are protected by the First Amendment. See *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952); *Jenkins* v. *Georgia,* 418 U. S. 153 (1974). Nevertheless, it maintains that any movie containing nudity which is visible from a public place may be suppressed as a nuisance. Several theories are advanced to justify this contention.

### A

Appellee's primary argument is that it may protect its citizens against unwilling exposure to materials that may be offensive. Jacksonville's ordinance, however, does not protect citizens from all movies that might offend; rather it singles out films containing nudity, presumably because the lawmakers considered them especially offensive to passersby.

This Court has considered analogous issues—pitting the First Amendment rights of speakers against the privacy rights of those who may be unwilling viewers or auditors—in a variety of contexts. See, *e. g., Kovacs* v. *Cooper,* 336 U. S. 77 (1949); *Breard* v. *Alexandria,* 341 U. S. 622, 641–645 (1951); *Cohen* v. *California,* 403 U. S. 15 (1971); *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974). See generally Haiman, Speech v. Privacy: Is There A Right Not To Be Spoken To?, 67 Nw. U. L. Rev. 153 (1972). Such cases demand delicate balancing because:

> "In th[e] sphere of collision between claims of privacy and those of [free speech or] free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society."

*Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 491 (1975).

Although each case ultimately must depend on its own specific facts, some general principles have emerged. A State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content. See *Kovacs* v. *Cooper, supra; Cox* v. *Louisiana,* 379 U. S. 536, 554 (1965); *Adderley* v. *Florida,* 385 U. S. 39 (1966). But when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power. See, *e. g., Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953); *Kovacs* v. *Cooper, supra,* at 97 (Jackson, J., concurring). Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, see *Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970),[4] or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure. See *Lehman* v. *City of Shaker Heights, supra.*[5] As Mr. Justice Harlan cautioned:

"The ability of government, consonant with the

---

[4] *Rowan* involved a federal statute that permits a person receiving a "pandering advertisement" which he believes to be "erotically arousing or sexually provocative" to instruct the Postmaster General to inform the sender that such mail is not to be sent in the future. The Court upheld the statute, emphasizing that individual privacy is entitled to greater protection in the home than on the streets and noting that "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." See 397 U. S., at 736–738.

[5] In *Lehman* the Court sustained a municipality's policy of barring political advertisements while permitting nonpolitical advertisements

Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Cohen* v. *California,* 403 U. S., at 21.

The plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, "we are inescapably captive audiences for many purposes." *Rowan* v. *Post Office Dept., supra,* at 736. Much that we encounter offends our esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, absent the narrow circumstances described above,[6] the burden

on city buses. The issue was whether the city had created a "public forum" and thereby obligated itself to accept all advertising. While concluding that no public forum had been established, both the plurality and concurring opinions recognized that the degree of captivity and the resultant intrusion on privacy is significantly greater for a passenger on a bus than for a person on the street. See 418 U. S. 298, 302–304 (opinion of BLACKMUN, J.), and *id.,* at 306–308 (DOUGLAS, J., concurring). See also *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467 (1952) (DOUGLAS, J., dissenting).

[6] It has also been suggested that government may proscribe, by a properly framed law, "the willful use of scurrilous language calculated to offend the sensibilities of an unwilling audience." *Rosenfeld* v. *New Jersey,* 408 U. S. 901, 905 (1972) (POWELL, J., dissenting). Cf. *Ginzburg* v. *United States,* 383 U. S. 463 (1966). In such cases the speaker may seek to "force public confrontation with the potentially offensive aspects of the work." *Id.,* at 470. It may not be the content of the speech, as much as the deliberate "verbal [or visual] assault," *Rosenfeld, supra,* at 906, that justifies

normally falls upon the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Cohen* v. *California, supra,* at 21. See also *Spence* v. *Washington,* 418 U. S. 405, 412 (1974).

The Jacksonville ordinance discriminates among movies solely on the basis of content.[7] Its effect is to deter drive-in theaters from showing movies containing any nudity, however innocent or even educational.[8] This

proscription. See *Redrup* v. *New York,* 386 U. S. 767, 769 (1967). In the present case, however, appellant is not trying to reach, much less shock, unwilling viewers. Appellant manages a commercial enterprise which depends for its success on *paying* customers, not on free-loading passersby. Presumably, where economically feasible, the screen of a drive-in theater will be shielded from those who do not pay.

[7] Scenes of nudity in a movie, like pictures of nude persons in a book, must be considered as a part of the whole work. See *Miller* v. *California,* 413 U. S. 15, 24 (1973); *Kois* v. *Wisconsin,* 408 U. S. 229 (1972). In this respect such nudity is distinguishable from the kind of public nudity traditionally subject to indecent-exposure laws. See *Roth* v. *United States,* 354 U. S. 476, 512 (1957) (DOUGLAS, J., dissenting) ("No one would suggest that the First Amendment permits nudity in public places"). Cf. *United States* v. *O'Brien,* 391 U. S. 367 (1968).

THE CHIEF JUSTICE's dissent, in response to this point, states that "[u]nlike persons reading books, passersby cannot consider fragments of drive-in movies as a part of the 'whole work' for the simple reason that they *see* but do not *hear* the performance . . . ." *Post,* at 222 (emphasis in original). At issue here, however, is not the viewing rights of unwilling viewers but rather the rights of those who operate drive-in theaters and the public that attends these establishments. The effect of the Jacksonville ordinance is to increase the cost of showing films containing nudity. See n. 8, *infra.* In certain circumstances theaters will avoid showing these movies rather than incur the additional costs. As a result persons who want to see such films at drive-ins will be unable to do so. It is in this regard that a motion picture must be considered as a whole, and not as isolated fragments or scenes of nudity.

[8] Such a deterrent, although it might not result in total suppression of these movies, is a restraint on free expression. See *Speiser*

discrimination cannot be justified as a means of preventing significant intrusions on privacy. The ordinance seeks only to keep these films from being seen from public streets and places where the offended viewer readily can avert his eyes. In short, the screen of a drive-in theater is not "so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it." *Redrup* v. *New York*, 386 U. S. 767, 769 (1967). Thus, we conclude that the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content.[9]

## B

Appellee also attempts to support the ordinance as an exercise of the city's undoubted police power to protect children. Appellee maintains that even though it cannot prohibit the display of films containing nudity to adults, the present ordinance is a reasonable means of protecting minors from this type of visual influence.

It is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults. See, *e. g.,* *Ginsberg* v. *New York*, 390 U. S. 629 (1968). Nevertheless, minors are entitled to a significant measure of First Amendment protection, see *Tinker*

---

v. *Randall*, 357 U. S. 513, 518–519 (1958). The record does not indicate how much it would cost to block public view of appellant's theater. Such costs generally will vary with circumstances. In one case the expense was estimated at approximately a quarter million dollars. See *Olympic Drive-In Theatre, Inc.* v. *City of Pagedale*, 441 S. W. 2d 5, 8 (Mo. 1969).

[9] We are not concerned in this case with a properly drawn zoning ordinance restricting the location of drive-in theaters or with a nondiscriminatory nuisance ordinance designed to protect the privacy of persons in their homes from the visual and audible intrusions of such theaters.

v. *Des Moines School Dist.*, 393 U. S. 503 (1969), and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them. See, *e. g., Interstate Circuit, Inc.* v. *City of Dallas,* 390 U. S. 676, 1968); *Rabeck* v. *New York,* 391 U. S. 462 (1968).

In this case, assuming the ordinance is aimed at prohibiting youths from viewing the films, the restriction is broader than permissible. The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing *any* uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach. Clearly all nudity cannot be deemed obscene even as to minors. See *Ginsberg* v. *New York, supra.*[10] Nor can such a broad restriction be justified by any other governmental interest pertaining to minors. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks un-

---

[10] In *Ginsberg* the Court adopted a variation of the adult obscenity standards enunciated in *Roth* v. *United States,* 354 U. S. 476 (1957), and *Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966) (plurality opinion). In *Miller* v. *California, supra,* we abandoned the *Roth-Memoirs* test for judging obscenity with respect to adults. We have not had occasion to decide what effect *Miller* will have on the *Ginsberg* formulation. It is clear, however, that under any test of obscenity as to minors not all nudity would be proscribed. Rather, to be obscene "such expression must be, in some significant way, erotic." *Cohen* v. *California,* 403 U. S. 15, 20 (1971). See *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 106–107 (1973) (BRENNAN, J., dissenting).

suitable for them. In most circumstances,[11] the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors. See *Tinker* v. *Des Moines School Dist., supra.* Cf. *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943). Thus, if Jacksonville's ordinance is intended to regulate expression accessible to minors it is overbroad in its proscription.[12]

### C

At oral argument appellee, for the first time, sought to justify its ordinance as a traffic regulation. It claimed that nudity on a drive-in movie screen distracts passing motorists, thus slowing the flow of traffic and increasing the likelihood of accidents.

Nothing in the record or in the text of the ordinance suggests that it is aimed at traffic regulation. Indeed, the ordinance applies to movie screens visible from public places as well as public streets, thus indicating that it is not a traffic regulation. But even if this were the purpose of the ordinance, it nonetheless would be invalid. By singling out movies containing even the most fleeting and innocent glimpses of nudity the legislative classification is strikingly underinclusive. There is no reason to think that a wide variety of other scenes in the custom-

---

[11] The First Amendment rights of minors are not "co-extensive with those of adults." *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 515 (1969) (STEWART, J., concurring). "[A] State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Ginsberg* v. *New York,* 390 U. S. 629, 649–650 (1968) (STEWART, J., concurring). In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor. See *Rowan* v. *Post Office Dept.,* 397 U. S., at 741 (BRENNAN, J., concurring).

[12] See Part III, *infra.*

ary screen diet, ranging from soap opera to violence, would be any less distracting to the passing motorist.

This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. See, *e. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488–489 (1955). This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley,* 408 U. S., at 95. Thus, "under the Equal Protection Clause, not to mention the First Amendment itself," *id.,* at 96, even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions. See also *Cox* v. *Louisiana,* 379 U. S. 559, 581 (1965) (opinion of Black, J.). Cf. *Williams* v. *Rhodes,* 393 U. S. 23 (1968); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969).

Appellee offers no justification, nor are we aware of any, for distinguishing movies containing nudity from all other movies in a regulation designed to protect traffic. Absent such a justification, the ordinance cannot be salvaged by this rationale.[13]

## III

Even though none of the reasons advanced by appellee will sustain the Jacksonville ordinance, it remains for us to decide whether the ordinance should be invalidated on

---

[13] This is not to say that a narrowly drawn nondiscriminatory traffic regulation requiring screening of drive-in movie theaters from the view of motorists would not be a reasonable exercise of police power. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 98 (1972), and cases cited.

its face. This Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights. Nonetheless, when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program. In accommodating these competing interests the Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, see *Dombrowski* v. *Pfister,* 380 U. S. 479, 497 (1965), and its deterrent effect on legitimate expression is both real and substantial. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612–615 (1973). See generally Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844 (1970).

In the present case the possibility of a limiting construction appears remote. Appellee explicitly joined in this test of the facial validity of its ordinance by agreeing to stay appellant's prosecution.[14] Moreover, the ordinance by its plain terms is not easily susceptible of a narrowing construction.[15] Indeed, when the state courts were presented with this overbreadth challenge they made no effort to restrict its application. Compare *Coates* v. *City of Cincinnati,* 402 U. S. 611, 612–613

---

[14] In this respect the present case arises in a posture that differs from most challenges to a statute or ordinance considered by this Court. Typically in such cases the issue arises in a context where the statute or ordinance has been applied to allegedly unprotected activity. Thus, we are able to consider the constitutionality of the statute "as applied" as well as "on its face."

[15] The only narrowing construction which occurs to us would be to limit the ordinance to movies that are obscene as to minors. Neither appellee nor the Florida courts have suggested such a limitation, perhaps because a rewriting of the ordinance would be necessary to reach that result.

(1971), and *Brandenburg* v. *Ohio,* 395 U. S. 444, 448–449 (1969), with *Cox* v. *New Hampshire,* 312 U. S. 569, 575–576 (1941), and *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572–573 (1942). In these circumstances, particularly where as here appellee offers several distinct justifications for the ordinance in its broadest terms, there is no reason to assume that the ordinance can or will be decisively narrowed. See *Gooding* v. *Wilson,* 405 U. S. 518, 520–527 (1972). Cf. *Grayned* v. *City of Rockford,* 408 U. S. 104, 111–112 (1972); *Time, Inc.* v. *Hill,* 385 U. S. 374, 397 (1967).

Moreover, the deterrent effect of this ordinance is both real and substantial. Since it applies specifically to all persons employed by or connected with drive-in theaters, the owners and operators of these theaters are faced with an unwelcome choice: to avoid prosecution of themselves and their employees they must either restrict their movie offerings or construct adequate protective fencing which may be extremely expensive or even physically impracticable.[16] Cf. *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 513 (1972) (POWELL, J., dissenting).

## IV

In concluding that this ordinance is invalid we do not deprecate the legitimate interests asserted by the city of Jacksonville. We hold only that the present ordinance does not satisfy the rigorous constitutional standards that apply when government attempts to regulate expression. Where First Amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity

---

[16] In this case appellant himself is a theater manager. Hence the statute's deterrent effect acts upon him personally; he is not seeking to raise the hypothetical rights of others. See *Breard* v. *Alexandria,* 341 U. S. 622, 641 (1951).

of purpose are essential. These prerequisites are absent here. Accordingly the judgment below is

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

I join wholeheartedly in the Court's view that the ordinance in issue here is fatally overinclusive in some respects and fatally underinclusive in others. I do not doubt that under proper circumstances, a narrowly drawn ordinance could be utilized within constitutional boundaries to protect the interests of captive audiences [1] or to promote highway safety. In these days of heavy traffic, it is reasonable to attempt to remove all distractions that might increase accidents. These legitimate interests cannot, however, justify attempts to discriminate among movies on the basis of their content—a "pure" movie is apt to be just as distracting to drivers as an "impure" one, and to be just as intrusive upon the privacy of an unwilling but captive audience. Any ordinance which regulates movies on the basis of content, whether by an obscenity standard [2] or by some other criterion, impermissibly intrudes upon the free speech rights guaranteed by the First and Fourteenth Amendments.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE REHNQUIST joins, dissenting.

Although the Court pays lip service to the proposition that "each case ultimately must depend on its own spe-

---

[1] See *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 305 (1974) (DOUGLAS, J., concurring in judgment); *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467 (1952) (DOUGLAS, J., dissenting).

[2] I adhere to my view that any state or federal regulation of obscenity is prohibited by the Constitution. *Roth* v. *United States,* 354 U. S. 476, 508–514 (1957) (dissenting); *Miller* v. *California,* 413 U. S. 15, 42–47 (1973) (dissenting); *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 70–73 (1973) (dissenting).

cific facts," *ante,* at 209, it strikes down Jacksonville City Code § 330.313 by a mechanical application of "general principles" distilled from cases having little to do with either this case or each other. Because I can accept neither that approach nor its result, I dissent.

The Court's analysis seems to begin and end with the sweeping proposition that, regardless of the circumstances, government may not regulate any form of "communicative" activity on the basis of its content. Absent certain "special circumstances," we are told, the burden falls upon the public to ignore offensive materials rather than upon their purveyor to take steps to shield them from public view. In four short sentences without reasoned support, *ante,* at 211–212, the Court concludes that Jacksonville's ordinance does not pass muster under its tests, and therefore strikes it down.

None of the cases upon which the Court relies remotely implies that the Court ever intended to establish inexorable limitations upon state power in this area. Many cases upheld the regulation of communicative activity and did not purport to define the limits of the power to do so. *E. g., Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974); *Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970); *Breard* v. *Alexandria,* 341 U. S. 622 (1951); *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). Other cases relied upon by the Court were either expressly or impliedly decided upon equal protection grounds and, although recognizing that First Amendment interests were involved, turned upon "the crucial question . . . whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972). See also *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953). Such a standard necessarily requires particularized review. Finally, yet other of the cases cited by the Court were

decided on vagueness and overbreadth. *E. g., Cox* v. *Louisiana,* 379 U. S. 536 (1965). Again, application of these doctrines requires scrutiny of the specific statute and activity involved rather than reliance upon generalizations. See, *e. g., id.,* at 544–558.

In short, nothing in this Court's prior decisions justifies disregard of the admonition that "the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the [First] Amendment to the speech in question." *Lehman* v. *City of Shaker Heights, supra,* at 302–303 (plurality opinion of BLACKMUN, J.). Rather, in applying this principle in contexts similar to the instant case, members of this Court have cautioned that every medium of communication "is a law unto itself," *Kovacs* v. *Cooper, supra,* at 97 (Jackson, J., concurring), and that the "tyranny of absolutes" should not be relied upon "to meet the problems generated by the need to accommodate the diverse interests affected by the motion pictures in compact modern communities." *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 518 (1952) (Frankfurter, J., concurring).

A careful consideration of the diverse interests involved in this case illustrates, for me, the inadequacy of the Court's rigidly simplistic approach. In the first place, the conclusion that only a limited interest of persons on the public streets is at stake here can be supported only if one completely ignores the unique visual medium to which the Jacksonville ordinance is directed. Whatever validity the notion that passersby may protect their sensibilities by averting their eyes may have when applied to words printed on an individual's jacket, see *Cohen* v. *California,* 403 U. S. 15 (1971), or a flag hung from a second-floor apartment window, see *Spence* v. *Washington,* 418 U. S. 405 (1974), it distorts reality to

apply that notion to the outsize screen of a drive-in movie theater. Such screens are invariably huge; [1] indeed, photographs included in the record of this case show that the screen of petitioner's theater dominated the view from public places including nearby residences and adjacent highways. Moreover, when films are projected on such screens the combination of color and animation against a necessarily dark background is designed to, and results in, attracting and holding the attention of all observers. See Note, Motion Pictures and the First Amendment, 60 Yale L. J. 696, 707–708 (1951). Similar considerations led Mr. Justice Brandeis, writing for the Court in *Packer Corp.* v. *Utah,* 285 U. S. 105 (1932), to conclude that there is a public interest in regulating billboard displays which may not apply to other forms of advertising:

> " 'Advertisements of this sort are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by the one who is to see and read the advertisement. The radio can be turned off, but not so the billboard or street car placard. These distinctions clearly place this kind of advertisment in a position to be classified so that regulations or prohibitions may be imposed upon all within the class.' " *Id.,* at 110.

---

[1] For example, in a case similar to this one the screen measured 35 feet by 70 feet and stood 54 feet above the ground. *Bloss* v. *Paris Township,* 380 Mich. 466, 157 N. W. 2d 260 (1968).

So here, the screen of a drive-in movie theater is a unique type of eye-catching display that can be highly intrusive and distracting. Public authorities have a legitimate interest in regulating such displays under the police power; for example, even though traffic safety may not have been the only target of the ordinance in issue here, I think it not unreasonable for lawmakers to believe that public nudity on a giant screen, visible at night to hundreds of drivers of automobiles, may have a tendency to divert attention from their task and cause accidents.

No more defensible is the Court's conclusion that Jacksonville's ordinance is defective because it regulates only nudity. The significance of this fact is explained only in a footnote:

> "Scenes of nudity in a movie, like pictures of nude persons in a book, must be considered as a part of the whole work. . . . In this respect such nudity is distinguishable from the kind of public nudity traditionally subject to indecent-exposure laws." *Ante,* at 211 n. 7.

Both the analogy and the distinction are flawed. Unlike persons reading books, passersby cannot consider fragments of drive-in movies as a part of the "whole work" for the simple reason that they *see* but do not *hear* the performance, cf. Note, *supra,* 60 Yale L. J., at 707, and n. 27; nor do drivers and passengers on nearby highways see the whole of the visual display. The communicative value of such fleeting exposure falls somewhere in the range of slight to nonexistent. Moreover, those persons who legitimately desire to consider the "work as a whole" are not foreclosed from doing so. The record shows that the film from which appellant's prosecution arose was exhibited in several indoor theaters in the Jacksonville area. And the owner of a drive-in movie theater is not prevented from exhibiting nonobscene films involving

nudity so long as he effectively shields the screen from public view. Thus, regardless of whether the ordinance involved here can be loosely described as regulating the content of a certain type of display, it is not a restriction of any "message." Cf. *Police Dept. of Chicago* v. *Mosley, supra,* at 95–96; *Grayned* v. *City of Rockford,* 408 U. S. 104, 115 (1972). The First Amendment interests involved in this case are trivial at best.

On the other hand, assuming *arguendo* that there could be a play performed in a theater by nude actors involving genuine communication of ideas, the same conduct in a public park or street could be prosecuted under an ordinance prohibiting indecent exposure. This is so because the police power has long been interpreted to authorize the regulation of nudity in areas to which all members of the public have access, regardless of any incidental effect upon communication. A nudist colony, for example, cannot lawfully set up shop in Central Park or Lafayette Park, places established for the public generally. Cf. *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 67 (1973); *Roth* v. *United States,* 354 U. S. 476, 512 (1957) (DOUGLAS, J., dissenting). Whether such regulation is justified as necessary to protect public mores or simply to insure the undistracted enjoyment of open areas by the greatest number of people—or for traffic safety—its rationale applies *a fortiori* to giant displays which through technology are capable of revealing and emphasizing the most intimate details of human anatomy.

In sum, the Jacksonville ordinance involved in this case, although no model of draftsmanship, is narrowly drawn to regulate only certain unique public exhibitions of nudity; it would be absurd to suggest that it operates to suppress expression of *ideas.* By conveniently ignoring these facts and deciding the case on the basis of

absolutes the Court adds nothing to First Amendment analysis and sacrifices legitimate state interests. I would affirm the judgment of the Florida Court of Appeal.[2]

MR. JUSTICE WHITE, dissenting.

The Court asserts that the State may shield the public from selected types of speech and allegedly expressive conduct, such as nudity, only when the speaker or actor invades the privacy of the home or where the degree of captivity of an unwilling listener is such that it is impractical for him to avoid the exposure by averting his eyes. The Court concludes "that the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content." *Ante,* at 212. If this broadside is to be taken literally, the State may not forbid "expressive" nudity on the public streets, in the public parks, or any other public place since other persons in those places at that time have a "limited privacy interest" and may merely look the other way.

I am not ready to take this step with the Court. Moreover, by the Court's own analysis, the step is an unnecessary one. If, as the Court holds in Part II–B of its opinion, the ordinance is unconstitutionally overbroad even as an exercise of the police power to protect children, it is fatally overbroad as to the population generally. Part II–A is surplusage. I therefore dissent.

---

[2] On my view of this case it is not necessary to deal with the issues discussed in Parts II–B, II–C, and III of the Court's opinion.