**UNITED STATES POSTAL SERVICE, Plaintiff,**

v.

**HUSTLER MAGAZINE, INC., LFP, Inc. Larry Flynt Publications, and Larry C. Flynt, Defendants.**

Civ. A. No. 85–560.

United States District Court, District of Columbia.

March 11, 1986.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Mark Foster, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This case presents the novel question of whether the statutory prohibition against mailing certain pandering advertisements, 39 U.S.C. § 3008, is constitutional where the "addressee" is a Member of Congress. Defendants wish to mail monthly issues of

*Hustler* magazine to every United States Senator and Representative. Under 39 U.S.C. § 3008, an "addressee" who receives by mail a "pandering advertisement"[1] may direct the United States Postal Service to prohibit the sender from making "any further mailings" to the addressee. The Supreme Court unanimously upheld the constitutionality of this statute in *Rowan v. United States Post Office Department,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).[2] Yet this opinion did not specifically consider the situation where, as here, the addressee is not a householder but a Member of Congress, and where the sender seeks to exercise not only his right to communicate but his right to petition the Government.

## BACKGROUND

The facts of this case are not in dispute. On or about September 4, 1983, Larry Flynt, publisher and editor of *Hustler* magazine, mailed a copy of the then current issue of *Hustler* to each Member of the United States Congress. The magazines all contained advertising for subscriptions to *Hustler.* An accompanying letter, signed by Larry Flynt, further described the contents of *Hustler* as the latest news, sex reviews, political satire, pornography, and in-depth investigative articles. Complaint in *Flynt v. USPS,* Civil Action No. 84–1986, attached as Ex. A to Defendants' Motion for Summary Judgment, ¶ 10. The letter also stated that Larry Flynt would continue to send the monthly issue of *Hustler* so that Members would be "well informed on all social issues and trends." *Id.*

The beneficiaries of this mailing did not all appreciate Larry Flynt's munificence on their behalf. As of October 29, 1984, approximately two-hundred and sixty-four Members of Congress had complained to the Postal Service. Under 39 U.S.C. § 3008, an addressee receiving "any pan-

dering advertisement which offers for sale matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative" may notify the Postal Service that he has received such mail matter and may request a prohibitory order. § 3008(a)–(b). The Postal Service then issues an order "directing the sender and his agents or assigns to refrain from further mailings to the named addressees." § 3008(b). In response to the Members' notices, the Postal Service issued approximately two-hundred and sixty-four prohibitory orders addressed to *Hustler* magazine; Larry Flynt, Publisher, *Hustler* magazine; F.S.C., Inc.; and Hustler Magazine, Inc. Each of these parties was an agent of the others. Stipulation, attached as Exhibit C to Defendants' Motion for Summary Judgment, ¶ 6.

More than thirty days after receipt of these prohibitory orders, Hustler Magazine, Inc. and F.S.C., Inc. mailed a second issue of *Hustler* to the Members of Congress named in the orders. Larry Flynt wrote these Members to explain that he would continue to send them *Hustler* "because I'm exercising my First Amendment rights to express my political and social views to public officials." *Flynt* Complaint ¶ 16. When over fifty Members again protested, the Postal Service issued complaints alleging that the prohibitory orders had been violated. *See* § 3008(d).

Larry Flynt, Hustler Magazine, Inc., and LFP, Inc., d/b/a Larry Flynt Publications, then filed suit in this court, Civil Action No. 83–3062, to obtain both a declaration that the prohibitory orders were invalid and an injunction against their enforcement. On February 2, 1984 we dismissed the action without prejudice for failure to exhaust administrative remedies. On April 30, 1984 a Postal Service hearing officer held that the prohibitory orders had been violated. The Postal Service affirmed this decision

---

1. Specifically, the statute aims at any pandering advertisement "which offers for sale matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative...." 39 U.S.C. § 3008(a).

2. At the time numbered § 4009, the statute before the Court was identical to what is now § 3008.

on May 22, 1984. Having thus exhausted their administrative remedies, on October 29, 1984 Larry Flynt and his co-plaintiffs refiled their action in this court, Civil Action No. 84–1986. In the meantime, they suspended the *Hustler* mailings to Congress on the advice of counsel.

On February 13, 1985, the Postal Service brought the present action against Hustler Magazine, Inc.; LFP, Inc.; Larry Flynt Publications; and Larry Flynt. The complaint requested a declaration that defendants had violated the prohibitory orders and an injunction enforcing the orders. Denying Mr. Flynt's motion to consolidate, we dismissed the action brought by Mr. Flynt and invited the plaintiffs in that case to raise their constitutional claims by way of defense in the action brought by the Postal Service.

Both parties have filed dispositive motions, and the case is now ripe for adjudication on the merits.

## DISCUSSION

The key issue before us is whether the word "addressee," as it is used in 39 U.S.C. § 3008, may constitutionally include Members of Congress. Since a Member of Congress who receives mail addressed to him or her fits the customary definition of an "addressee," § 3008 as written clearly applies to the facts of this case. Defendants in fact defend only on the ground that the prohibitory orders violate the First Amendment of the Constitution. Yet, as the Supreme Court held in *Rowan v. United States Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), § 3008 is constitutional on its face. The plaintiff places its chief reliance on *Rowan*, and at first glance, this decision would seem to expose as frivolous defendants' constitutional defense.

The Supreme Court's general endorsement of § 3008, however, does not necessarily prove the constitutionality of the statute as applied to the present case. In *Rowan*, the Court specifically balanced

"the right of every person 'to be let alone'" against "the right of others to communicate." 397 U.S. at 736, 90 S.Ct. at 1490. After weighing these two rights, it upheld the statute on the ground that "a mailer's right to communicate must stop at the mailbox of an unreceptive addressee." 397 U.S. at 736–37, 90 S.Ct. at 1490. Yet in protecting the right of the addressee, the Court, faced with the facts before it, focused on only one type of addressee—the householder.

A close reading of the opinion reveals the Supreme Court's repeated interpretation of "addressee" as "householder." The first sentence, for example, equates these two terms in summarizing the statute: "a *person* may require that a mailer remove his name from its mailing lists and stop all future mailings to the *householder.*" 397 U.S. at 729, 90 S.Ct. at 1486 (emphasis added). The Court's mention of Congress' declared objective to protect "minors and the privacy of homes," 397 U.S. at 732, 90 S.Ct. at 1488, further emphasizes its concern for the privacy interests of householders.

Concededly, the *Rowan* opinion specifically balances the sender's right to communicate against the right belonging not just to the homeowner but to the general addressee.[3] In applying this balancing test, however, the Court placed the addressee's "right to be let alone" within the confines of the home. For example, in explaining the importance of the right to be let alone, the opinion notes that "a sufficient measure of individual autonomy must survive to permit every *householder* to exercise control over unwanted mail." 397 U.S. at 736, 90 S.Ct. at 1490 (emphasis added). Similarly, after deciding that the homeowner's right prevails, the Court analogized such right as a form of property when it stated "[t]o hold less would tend to license a form of trespass." 397 U.S. at 737, 90 S.Ct. at 1490. At the end of the First Amendment discussion the Court yet

---

**3.** "But the right of every *person* 'to be let alone' must be placed in the scales with the right of others to communicate." 397 U.S. at 736, 90 S.Ct. at 1490 (emphasis added).

again highlighted the home-oriented vision of the decision. Rejecting the vendor's right to send unwanted material into the "home" of another, it concluded, "[t]he asserted right of a mailer, we repeat, stops at the outer boundary of every person's *domain.*" 397 U.S. at 738, 90 S.Ct. at 1491 (emphasis added).

It is not only this vocabulary that demonstrates the Supreme Court's primary concern for protecting the privacy interests of householders. Subsequent cases confirm the Court's limited focus in *Rowan.* In *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), for instance, the Court vacated an injunction against distributing any literature in the city of Westchester, Illinois. "Among other important distinctions," it observed that unlike the case before it, *Rowan* had involved the right of privacy enjoyed by the householder. 402 U.S. at 420, 91 S.Ct. at 1578. Later cases reinforce this link between the *Rowan* decision and privacy in the home. *See Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 542 n. 11, 100 S.Ct. 2326, 2336 n. 11, 65 L.Ed.2d 319 (1980); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209 n. 4, 95 S.Ct. 2268, 2272 n. 4, 45 L.Ed.2d 125 (1975); *Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).

The Supreme Court's reading of "addressee" as a householder clearly conforms with the intent of Congress when it enacted the bill that later became § 3008. As the legislative history notes, there was great public pressure for some measure to control unsolicited mailing of offensive, sex-related advertising. The Post Office was being deluged with a growing number of complaints each year about such mail. H.Rep. No. 722, 90th Cong., 1st Sess. 68 (1967). Most of these complaints came from parents whose minor children had received the material. *Id.* Congress viewed the bill as a direct response to these complaints and a "reasonable solution to the continuing problem faced by the *homeowner* of receiving unsolicited and undesirable sex-related matter." *Id.* (emphasis added).[4]

This emphasis on the householder's right to be let alone reflects the privileged constitutional status of the home. It is beyond dispute that the walls of one's house enclose a unique zone of privacy. *See Consolidated Edison,* 447 U.S. at 542 n. 11, 100 S.Ct. at 2336 n. 11 (recognizing "the special privacy interests that attach to persons who seek seclusion within their own homes"). The Government may not intrude at will into this enclave. *See* Amendment III (no quartering of soldiers); Amendment IV (no unreasonable searches or seizures). Similarly, inside the home, individuals enjoy certain liberties foreclosed to them in public. *See e.g., Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (sanctioning private possession of obscene matter for personal use). Among these liberties is the right to deny communication by an outsider. Whereas outside the home, "the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker...", *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 749 n. 27, 98 S.Ct. 3026, 3040 n. 27, 57 L.Ed.2d 1073 (1978), once inside, the individual's right to

---

**4.** It is abundantly clear from the legislative history that Congress' primary concern in approving legislation to limit offensive mail matter was to protect families. Although the committee reports use general nouns, such as "mail recipient," "citizen," "person," and of course "addressee," the substantive focus is on the homeowner. Congress specifically described the popular pressure for the bill as demands for steps "to afford *parents* a means to stop this material from reaching their children through the U.S. mails." H.Rep. No. 722 at 68 (emphasis added). In its final version, the bill struck the proper balance between an individual's right to privacy "in his *home or other place of abode*" and a sender's right to communicate. S.Rep. No. 801, 90th Cong., 1st Sess. 37, *reprinted in* 1967 U.S. Code Cong. & Ad.News, 2258, 2294–95 (emphasis added). As the floor debates also stress, the Congress that enacted the bill giving unfettered discretion to the "addressee" was thus concentrating on privacy of the homeowner and protection of children. *See, e.g.,* 113 Cong.Rec. 28,660 (1967) (remarks of Rep. Waldie) ("I am the supreme court in the particular household in which my children reside...").

be left alone "plainly outweighs the First Amendment rights of an intruder." *Id.* at 748, 98 S.Ct. at 3040 (citing *Rowan,* 397 U.S. 728, 90 S.Ct. at 1484); *see also Martin v. Struthers,* 319 U.S. 141, 148, 63 S.Ct. 862, 865–66, 87 L.Ed. 1313 (1943)(city can punish those who call at home in defiance of previously expressed will of occupant).

However, the special privacy rights enjoyed inside the home—emphasized by both Congress in enacting and the Supreme Court in reviewing § 3008—do not apply where, as here, the mailing is sent to the office of a Member of Congress. We recognize that the right to be let alone, what Justice Holmes called "the right most valued by civilized men," *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Holmes, J., dissenting), does not necessarily vanish when one steps outside one's front door. *See Public Utilities Commission v. Pollak,* 343 U.S. 451, 467, 72 S.Ct. 813, 823, 96 L.Ed. 1068 (1952) (Douglas, J., dissenting). However, this privacy right is less absolute when asserted outside the home. *See Erznoznik,* 422 U.S. at 209 n. 4, 95 S.Ct. at 2272 n. 4 (individual privacy is entitled to greater protection in the home than in the streets); *Public Utilities Commission v. Pollak,* 342 U.S. at 463–65, 72 S.Ct. at 821–22 (holding that radio programs on public streetcars do not violate passengers' privacy rights). Defendants have not sent and do not propose to send copies of *Hustler* to the home of each Member of Congress. By seeking to mail their magazine to the Member's office instead, defendants do not threaten the unique privacy interests that attach in the home.[5] The concerns in *Rowan* thus do not reach the facts before us.

Members of Congress are in a different category from "addressees" who are householders. As elected representatives of the people, they cannot simply shield themselves from undesirable mail in the same manner as an ordinary addressee. Private citizens bear no obligation even to acknowledge the views of others. Members of Congress, on the other hand, are chosen to speak for those who elected them. As the framers of the Constitution expressly contemplated, a Senator or Congressman should naturally "take care to inform himself of [his fellow citizens'] dispositions and inclinations...." The Federalist No. 35, at 221 (J. Cooke ed. 1961). It is this dependence on public opinion that helps to forge "the strong chords of sympathy between the representatives and the constituent." *Id.* A Member of Congress thus cannot "be let alone" without neglecting his or her duties as a representative.

Furthermore, by assuming their offices, Members of Congress, like many others in the public eye, forfeited certain claims to privacy they otherwise might assert. For example, Members of Congress are public officials, and must accept the stricter standard of libel set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Members of Congress are subject to strict financial disclosure requirements. *See* 2 U.S.C. §§ 701, *et seq.* A Member's background, affiliations, statements, votes in Congress, even private life, are constantly on public display. A Member operates "in a fish bowl." It thus cannot be seriously challenged that a Member of Congress does not enjoy the same measure of privacy as an ordinary citizen. Of course in the home a Member possesses the same rights as his or her constituents. In the home a Member can invoke the special privileges as a householder, including the privilege of stopping undesirable mail under § 3008. Yet once a Member leaves home for the office, this privacy, this right to be let alone, significantly weakens and in many situations is non-existent.

On the other side of the balance, defendants assert their right to communicate as part of the Free Speech component of the First Amendment. Yet defendants here invoke more than the right simply to communicate. Larry Flynt sent *Hustler* to Members of Congress in order "to express

---

**5.** By sending *Hustler* to the office defendants would also avoid the problem that so troubled Congress—exposure of minors to sexual advertising matter.

my political and social views to public officials." Through their mailings to Congress, therefore, defendants seek to exercise their right under the First Amendment to the Constitution "to petition Government for redress of grievances."

The right to petition the Government is part of our heritage from earliest times and represents a cornerstone of our national liberty. It is a right long-recognized as implicit in "[t]he very idea of a government, republican in form." *United States v. Cruikshank*, 2 Otto 542, 552, 92 U.S. 542, 552, 23 L.Ed. 588 (1875). As the Supreme Court noted in *McDonald v. Smith*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), the historical roots of the petition clause long antedate the Constitution. —— U.S. at ——, 105 S.Ct. at 2788. The English Bill of Rights of 1689, enacted after the Glorious Revolution of 1688, guaranteed "the right of the subjects to petition the King." 1 Wm. & Mary, Sess. 2, ch. 2. The early colonists in Massachusetts included a petition clause in the Massachusetts Body of Liberties of 1641, "the first detailed American Charter of Liberties." *See* 1 B. Schwartz, *A Documentary History of the Bill of Rights* 69, 73 (1971). During the Revolutionary period, the right to petition was again raised as an essential ingredient of self-government in both the Stamp Act Congress' Declaration of Rights and Grievances of 1765 and the Declarations and Resolves of the First Continental Congress of 1774. *See* 1 Schwartz at 198, 217. Now guaranteed by the First Amendment, the right to petition "is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald*, —— U.S. at ——, 105 S.Ct. at 2788; *see Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322–23, 89 L.Ed. 430 (1945) (right to petition inseparable from other First Amendment rights). Accordingly, courts have protected this right when its existence has arisen in varied contexts, from prisons, *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972), to state capitols, *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963). And they have protected this right in varied forms, from peaceful boycotts of private businesses, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907–11, 102 S.Ct. 3409, 3422–25, 73 L.Ed.2d 1215 (1982), to appeals to one or all three branches of the Government, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972).

While the right to petition Government is "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers of America v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), we recognize that this right, like many rights, is not absolute but can be subject to reasonable limitations. Where the right to petition conflicts with other legitimate interests, for example, the Constitution permits some restraint. *A Quaker Action Group v. Morton*, 516 F.2d 717, 725 (D.C. Cir.1975) (permits in Lafayette Park); *cf. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (prohibition on camping in Lafayette Park). Furthermore, the right to petition Government does not guarantee the right to participate in Government. *Minnesota Board for Community Colleges v. Knight*, 465 U.S. 271, 104 S.Ct. 1058, 1065–66, 79 L.Ed.2d 299 (1984)(upholding statute prohibiting direct teacher involvement in academic governance); *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915) (upholding increase in property valuation despite lack of public participation: "There must be a limit to individual argument in such matters if government is to go on").

Pursuant to § 3008 the plaintiff would ban "all further mailings" by defendants to Members of Congress. Yet the facts of the present case do not justify such a severe restraint. Already defendants confront other restrictions on their ability to petition Congress through the mail. They cannot, for example, send matter that exceeds the size and weight limits prescribed

for a particular class of mail. 39 U.S.C. § 3001(c)(1)(A). Nor can they send a bomb or other dangerous material to Members of Congress. 39 U.S.C. § 3001(a); 18 U.S.C. § 1716(a). In anything they mail, they are subject to the laws of defamation for statements which are libelous. *McDonald,* —— U.S. ——, 105 S.Ct. 2787.

Defendants face more serious limitations on their ability to present their petitions. Defendants do not enjoy unlimited access to Members' offices: the staff can always exclude them. As with most citizens, their ability to participate in Congressional hearings is circumscribed. *See Minnesota Board for Community Colleges,* 104 S.Ct. 1058. They likely cannot parade outside Members' windows with a bullhorn or set up displays in the halls of the office buildings. In short, mail—and its modern extension, the telephone—offers perhaps the only way defendants can convey their petitions to Congress. As a result, a prohibitory order under § 3008 would effectively deny defendants' right to petition Congress at all.

Weighing the defendants' constitutional right to petition Congress against the limited right of Members of Congress to be let alone in their offices, we conclude that § 3008 is not a valid basis to prohibit all further mailings to Congress. In balancing these interests we are aware that by curtailing defendants' right to communicate through the mails, § 3008 operates as a prior restraint on defendants' expression of their views to Congress. Any such prior restraint on expression carries a heavy presumption against its constitutional validity. *Organization for a Better Austin,* 402 U.S. at 419, 91 S.Ct. at 1577–78; *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). Plaintiff's only justification for the prohibitory orders is that they screen the addressees from offensive mail. This is not enough. As a citizen Larry Flynt may wish to petition Congress on matters quite unrelated to the sexual theme of *Hustler* magazine. By commanding the Postal Service to prohibit "all further mailings" and thus preventing

all petitions to Congress, § 3008 sweeps too broadly.

Even if we put aside the issue of the right to petition and view the prohibitory orders as merely restrictions on speech, a prohibition on "all further mailings" to Congress cannot stand. We recognize that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); *Adderley v. Florida,* 385 U.S. 39, 47–48, 87 S.Ct. 242, 247–48, 17 L.Ed.2d 149 (1966). Government may properly limit speech through reasonable time, place and manner restrictions. *Clark v. Community for Creative Non-Violence,* 104 S.Ct. at 3069; *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984) (ordinance prohibiting posting signs on public property); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (antinoise ordinance). To be valid, however, such a restriction must satisfy three criteria: (1) it must be content-neutral; (2) it must serve a significant government interest, and (3) it must leave open ample alternative channels for communication of the information. *Heffron,* 452 U.S. at 648, 101 S.Ct. at 2564; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

The prohibitory orders required under § 3008 fail all three tests. First, while they would ban all mail by defendants to Congress, the restrictions are rooted in content discrimination. They condemn defendants precisely for the message defendants convey. They are not content-neutral; they are content-oriented. Second, the restrictions serve no governmental interest. Prohibitory orders benefit Members of Congress in their individual capacity, their understandable dislike for *Hustler* magazine. Their personal predilections are not sufficient justification. There is no evidence that the orders are necessary to prevent either disruption to mail handling or

other threats to Members in carrying out their official functions. Third, as we have discussed, interdiction of all mail to Congress does not leave open ample alternative channels of communication, since mail is virtually the only medium defendants can at least somewhat freely use to communicate with Congress.

■ Although plaintiff apparently recognizes the constitutional infirmity of a ban on all mailings to Congress, see Pl. Reply at 4–5, its attempts to narrow the prohibitory orders also fail the test of constitutionality. In its Complaint, the Postal Service requests an order enjoining defendants from mailing to the Members named in the prohibitory orders "Hustler Magazine, or any other pandering advertisment offering for sale matter believed by any [of the named Members] to be erotically arousing or sexually provocative." In failing to define precisely the contours of the prohibition, the order plaintiff requests would be unconstitutionally vague. *See United States v. Cardiff,* 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952) (inspection provision in Federal Food, Drug, and Cosmetic Act too vague to enforce). Defendants would not know which of their mailings might strike a particular Member as "erotically arousing or sexually provocative." Rather than incur a "substantial risk of miscalculation," *Rowan,* 397 U.S. at 740, 90 S.Ct. at 1492, which here would lead to a charge and conviction for criminal contempt, § 3008(e), defendants might choose to send nothing at all to Congress. In other words, the subjective standard of plaintiff's proposed injunction against "any other pandering advertisement" would discourage defendants from mailing any petition. The Constitution does not sanction such a chilling effect on the exercise of a fundamental constitutional right. *See Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100

S.Ct. 826, 836, 63 L.Ed.2d 73 (1980); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *New York Times v. Sullivan,* 376 U.S. at 271–72, 84 S.Ct. at 721 ("breathing space"); *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964).[6]

Nor would simply enjoining defendants from mailing only *Hustler* to Members of Congress salvage the constitutionality of § 3008 as applied to the facts of this case. On a practical level, such an injunction would limit defendants' freedom in petitioning Congress through the mailing of *Hustler* without offering Congress much protection in return. Although prevented from mailing *Hustler,* defendants would still be able to send Members of Congress other magazines the Members might find equally offensive. Similarly, in lieu of *Hustler* itself defendants could simply mail packages containing loose photographs, articles and advertisements. Such easy evasion of the intended aim of the injunction would make any such order by this court a Pyrrhic victory for plaintiff.

Moreover, even with regard to an order confined to *Hustler,* the interests of Members of Congress still cannot outweigh defendants' First Amendment rights not only to communicate and express their views but also to petition Members of Congress. As we have discussed above, the right to be let alone provides a Member of Congress only limited refuge in the office. Furthermore, receiving *Hustler* once each month would not unduly burden a Member of Congress. Members are not forced to read the magazine or other of the mail they receive in volume. We cannot imagine that Congressional offices all lack wastebaskets. *See Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) ("the 'short, though regular, journey from mail box to trash can

---

6. Likewise, an order that prohibited defendants from mailing *Hustler* and any "similar materials" is clearly unacceptable. In addition to the vagueness problem discussed above, the phrase "similar materials" would require plaintiff to evaluate defendants' future mailings to deter-

mine if they were indeed "similar" to *Hustler.* The Supreme Court has rejected this practice as creating "the appearance if not the substance of governmental censorship." *Rowan,* 397 U.S. at 735, 90 S.Ct. at 1489.

... is an acceptable burden at least so far as the Constitution is concerned' ")(quoting *Lamont v. Commissioner of Motor Vehicles,* 269 F.Supp. 880, 883 (S.D.N.Y.1967), *aff'd,* 386 F.2d 449 (2d Cir.1967), *cert. denied,* 391 U.S. 915, 88 S.Ct. 1811, 20 L.Ed.2d 654 (1968)).

On the other side of the balance, defendants' rights to communicate and to petition lose none of their vitality simply because of the content of their focus.[7] An order prohibiting defendants from mailing *Hustler* magazine would nonetheless allow defendants to send any other material. The only distinction between *Hustler* and permissible mail matter is that certain Members of Congress find *Hustler* offensive. This is a distinction based on content. Yet "the Government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (striking down ordinance prohibiting non-labor picketing near school). *See also Cox v. Louisiana,* 379 U.S. 536, 557, 580–81, 85 S.Ct. 453, 465, 469–70, 13 L.Ed.2d 471 (1965) (opinion of Black, J.); *NAACP v. Button,* 371 U.S. 415, 444–45, 83 S.Ct. 328, 343–44, 9 L.Ed.2d 405 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131 (1949). We can discriminate among types of petitions defendants may wish to present only if the distinction is "tailored to serve a substantial governmental interest." *Mosley,* 408 U.S. at 99, 92 S.Ct. at 2292. Plaintiff has shown no substantial governmental interest to justify a ban on *Hustler.* Shielding individual Senators and Repre-

sentatives from potential injury to their tastes and aesthetic sensibilities is not enough to support the content-based restriction requested here.[8]

While Members of Congress may not share the views embodied in *Hustler,* the right to present unwelcome petitions is entitled to no less protection than the right to petition for causes long espoused by the majority. The First Amendment protects controversial as well as conventional dialogue. *Whitehill v. Elkins,* 389 U.S. 54, 57, 88 S.Ct. 184, 185–86, 19 L.Ed.2d 228 (1967); *see Organization for a Better Austin,* 402 U.S. at 419, 91 S.Ct. at 1578 ("so long as the means are peaceful, the communication need not meet standards of acceptability"). Unlike solicitations sent to the home, mailings to Congress may contribute, for better or worse, to public dialogue and discussion. An order prohibiting even just the mailing of *Hustler* to Congress would deny our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." *New York Times v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721. The expression of diverse views, including those presented in *Hustler* magazine, furthers vigorous public debate. Balanced against the defendant's First Amendment rights, previously discussed, the asserted right of Members of Congress to be let alone lacks the weight to sustain the constitutionality of § 3008.

Accordingly, we hold that as applied to "addressees" who are Members of Congress, 39 U.S.C. § 3008 is unconstitutional.[9] We will therefore grant defendants' motion for summary judgment and dismiss plain-

---

**7.** Defendants in their mailings are and continue to be subject to federal and state laws concerning obscenity. Presumably, defendants are well aware of this fact.

**8.** The content discrimination inherent in prohibiting defendants from mailing *Hustler* to Congress also invalidates this ban as a reasonable time, place and manner restriction on speech. While such a prohibition would leave open other channels of communication, it still fails the other two requirements of a permissible restraint on speech—content neutrality and significant governmental interest.

**9.** This decision is consistent with the *Rowan* decision and its rationale. We regard that opinion as applying only to householders. We reserve judgment on the constitutionality of § 3008 as applied to private citizens who receive mail other than at their home. That issue does not confront the court today. In view of our holding, we also do not need to reach defendants' contention that a Congressional office is a public forum.

tiff's complaint for injunctive relief. An order consistent with the foregoing has been entered this day.