J-S12025-23

2023 PA Super 209

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                         :            PENNSYLVANIA
                                 :

                v.               :

                                 :

KATHRYN DANA PAPP              :

                                 :

                Appellant      :      No. 1394 MDA 2022

Appeal from the Judgment of Sentence Entered May 3, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004780-2020

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and COLINS, J.[*]

OPINION BY McCAFFERY, J.:          **FILED OCTOBER 20, 2023**

Kathryn Dana Papp (Appellant) appeals from the judgment of sentence of a $100 fine imposed in the Dauphin County Court of Common Pleas following her jury conviction of one count of harassment – communicates repeatedly.[1]  On appeal, she argues:  (1) the harassment statute is violative of the free speech protections in both the United States and Pennsylvania Constitutions on its face and as-applied; (2) the trial court erred in failing to instruct the jury regarding constitutionally protected activity under both the United States and Pennsylvania Constitutions; and (3) the evidence was insufficient to support her conviction.  For the reasons below, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2709(a)(7).

## I.   FACTS & PROCEDURAL HISTORY

The facts underlying Appellant's conviction, as developed during the jury trial, are as follows:

On August 4, 2020, Mark Hoover (hereinafter "Victim") and his wife took their 4-year-old dog, Flash, to Noah's Ark Veterinary Center ("Noah's Ark") for an annual check-up and vaccinations. Appellant was the veterinarian on duty that day at Noah's Ark. When Victim and his wife went to pick up Flash from Noah's Ark, Appellant stated that she believed Flash suffered from diabetes insipidus, and she recommended a medication called Desmopressin. Heeding Appellant's recommendation, Victim gave Flash a dose of the medication that had been prescribed. By the next evening, Flash had suffered two seizures, which prompted Victim to take Flash to an emergency veterinarian center called Shores. After the visit to Shores, Victim stopped administering the Desmopressin to Flash, and according to Victim, Flash had no subsequent seizures. Despite Victim's requests, however, the veterinarian at Shores did not provide an opinion on whether Appellant had erred by prescribing the Desmopressin.

On the afternoon of August 5, 2020, the same day that Flash suffered his two seizures, Victim took his other dog, 13-year-old Nick, to Noah's Ark for a check-up and vaccinations as he had done with Flash the previous day. Per COVID protocol that was in effect at the time, when Victim went to pick up Nick, Victim remained in his vehicle and called into the office to tell the staff that he was there to pick up Nick. When Victim called in, an administrative assistant answered the phone and quoted him the cost for the visit. When Victim questioned the cost, the assistant explained that various services had been performed on Nick, including x-rays and bloodwork. Victim began to dispute the charges for these services, explaining that he had only authorized vaccinations and an annual check-up. At that point, the assistant transferred the call to Appellant, who was again the veterinarian on duty.

According to Victim, when he questioned Appellant about the charges, Appellant began "berating" Victim, cursing at him, and accusing him of being abusive to his animals. Wanting to end the phone conversation, Victim told Appellant to just bring Nick out to his vehicle. When Victim got out of his vehicle to retrieve

Nick, Appellant continued to yell at him, accusing him of being an abusive pet owner and proclaiming that she was going to report Victim for animal abuse. Eventually, Victim placed Nick in his SUV, Appellant threw some papers into the back of Victim's vehicle, and Appellant backed away from Victim's vehicle as Victim was closing the tailgate. Victim asked Appellant to send him a bill for the charges that he had approved, and he left Noah's Ark. Victim recalled that Appellant seemed upset and made a comment about how she would "have to eat the bill."

Later [during] the evening of August 5, 2020, after the argument between Appellant and Victim at Noah's Ark, Victim received a text message from Appellant which contained a video of his dog Flash. The video focused on Flash's eyes, as his vision had been adversely affected by his diabetes insipidus condition. Accompanying the video was a one-word message which read: "Abuse."

Later the same evening, Victim received a friend request from Appellant on Facebook. Victim did not accept Appellant's friend request, but throughout the course of the evening, from approximately 5:30 p.m. to 11:41 p.m., Appellant sent Victim a multitude of messages via Facebook Messenger.

The first Facebook message, sent by Appellant at 5:33 p.m., stated: "*You have only ever brought Nick to Noah's Vet Center two times ever and declined all diagnostics and only wanted vaccines. I will be reporting you for mistreatment of your pets.*" Victim responded to the Appellant's message as follows: "*At this point you should end all contact with me other than for payment for wellness visit and shots we approved.*"

Despite Victim's request that Appellant end all contact, Appellant continued to send Victim various Facebook messages throughout the evening. Appellant's second message, which was sent about an hour after the first, read: "*Actually you can block me anytime you like, but I sent him my email. We are reporting you and you can contact my attorney.*" [Victim testified that he is not tech savvy and would have required his son's assistance to block Appellant on Facebook.]

A third Facebook message from Appellant stated: "*Too bad your pet wasn't well enough to receive the shots you approved.*" Appellant's fourth Facebook message, which was lengthier, read as follows:

*Talk about unethical. I have never met two people who care less for the wellbeing of their pets.*

*Pretty fucked up that your four-year-old dog walked around blind for four years with his pupils completely dilated like some crack addict and you guys happen to not notice or care*[.]

*That you declined every single year testing for heartworm and the three tick diseases*[.]

*That you were trying to give a vaccine which affects the immune system to a dog with an ALP*[2] *over 2000 and possibly kill him.*

*And don't worry about putting me up on Facebook because I'm already gonna put you all there complete with all the information [seeing as you] didn't pay for it and I get to own it*[.[3]]

After Appellant's fourth Facebook message, which was sent at approximately 7:00 p.m., [Victim] sent a response at 7:45, in which he said: "*As stated before, please stop contacting me.*" Appellant replied by stating: "*It is a free world. You can block people easily on Facebook. Ouch, this must hurt.*" Appellant then sent Victim various pictures of Victim's financial information that Appellant had retrieved on the internet. Moreover, Appellant sent Victim a screenshot of information she had retrieved regarding Victim's wife, including her name and date of birth as well as information about a traffic violation that Victim's wife incurred in 2013.

At about 9:54 p.m., Appellant messaged Victim on Facebook again, this time giving Victim the name of Appellant's lawyer and telling Victim to contact the lawyer if he had any issues. Shortly thereafter, Appellant sent another brief Facebook message,

---

[2] "ALP" is not explained or defined in the briefs or the record.

[3] We have corrected the trial court's recitation of the messages to reflect the structure of the message as set forth in the exhibit presented at trial. *See* N.T. Jury Trial, 5/2-3/2022, at 38-40; Commonwealth's Exhibit 3.

stating: "*I do not have time for low lifes with broke moral compasses.*"

Somewhere around that time, Victim contacted the Lower Paxton Township Police Department. Victim spoke with Officer Derek Day and conveyed that he believed he was being harassed by Appellant. After speaking with Victim, Officer Day contacted Appellant and left a message that he wished to speak with her. Appellant returned the call and spoke with Officer Day. According to the Officer, Appellant stated that she should have stopped communicating with Victim after he requested she stop, and she admitted that her "mouth can get her in trouble sometimes." Appellant also indicated to the Officer that she wanted to report Victim to the Humane Society for abuse, and the Officer informed her that she could report Victim to the police if she wanted to. There was no evidence presented, however, to indicate that Appellant reported Victim to either the Humane Society or the police.

Shortly before midnight, after Victim and Appellant had both spoken with Officer Day, Victim responded to Appellant's most recent Facebook message, telling Appellant: "*I have contacted the police. You are harassing me. Please stop.*" Shortly thereafter, at around 11:41 p.m., Appellant replied by stating: "*We've chatted. I told them everything.*" That message was the last message exchanged between Appellant and Victim.

Trial Ct. Op., 11/30/22, at 2-6 (record citations omitted & some paragraph breaks added).

However, there were two other communications introduced and discussed at trial — a post on Appellant's personal Facebook page, and an email sent from Appellant to Victim and his wife. Victim testified that after receiving the message from Appellant stating she was "going to put [him] up on Facebook[,]" he looked at her personal profile and saw a post dated the day before, August 4th. *See* N.T., Jury Trial, at 53-54, 68. The post included pictures of various animals, including the video of Flash that Appellant had

texted to Victim, with a caption that read: "Yet another crazy one. So grateful for wonderful pet owners" with a heart emoji. ***See id.*** at 53; Defendant's Exhibit 1. Although this was posted before his interaction with Appellant, Victim interpreted this as a negative comment about him. ***See*** N.T., Jury Trial, at 54.

Moreover, while Appellant was sending Victim a barrage of messages on Facebook on August 5th, she also sent him and his wife the following email at 6:20 p.m.:

> Subject: Re: Flash differentials
>
> You both are being reported for lack of proper veterinary care for your pets. We have seen Nick only 2 times EVER and you declined ALL diagnostics and requested ONLY vaccines. He is close to 14 [years old] and that is 2 total visits. You are inhumane. You have a BLIND 4 [year old] dog you couldn[']t even realize was blind nor treat!! I have the rads, bloodwork, pictures, videos and more to support this. If you would like to sue, for absolutely anything at all, please contact my father and personal attorney, Allen N[.] Papp, directly at his law firm – Adams, Cassese & Papp.
>
> Best regards to both of you uncaring assholes,
>
> Kathryn Papp, DVM

N.T., Jury Trial, at 44-45; Commonwealth's Exhibit 8.

Appellant was subsequently charged with one count of harassment – communicates repeatedly, a misdemeanor of the third degree. On September 23, 2021, she filed an omnibus pretrial motion seeking dismissal of the charge on two bases: (1) the facts were insufficient to sustain a conviction of harassment; and (2) the charge violated both the First Amendment of the

United States Constitution[4] and Article 1, Section 7 of the Pennsylvania Constitution.[5] *See* Appellant's Omnibus Pre-trial Motion, 9/23/21, at 4-6. The Commonwealth filed a response, and the trial court subsequently denied the motion.[6]

The case proceeded to a two-day jury trial conducted on May 2 and 3, 2022. Victim and Officer Day testified on behalf of the Commonwealth. Appellant testified in her own defense.

> [She] claimed that she had sent all the messages because she believed the dogs had serious medical conditions, and she was frustrated that Victim and his wife would not listen to her and had accused her of being a bad veterinarian. She testified that she was "so worked up that [she] used improper language", that she was "haughty" and "overreacted", and she conceded that she "should have taken a step back and more calmly explained why [Victim and his wife] should have been more concerned."

---

[4] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press").

[5] *See* Pa. Const. art. 1, § 7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.")

[6] No order denying Appellant's pretrial motion appears in the certified record or on trial court docket. However, following the Commonwealth's case-in-chief at trial, Appellant moved for a judgment of acquittal based on the same arguments she made in her pretrial motion, and, in particular, the fact that she was being prosecuted only for her speech, not for her conduct. *See* N.T., Jury Trial, at 85-86. At that time, the trial court stated that the pretrial motion had been denied by another judge. *See id.* at 86. Appellant agreed, noting that the pretrial judge "said it would be more appropriate" to address after the Commonwealth presented its case. *Id.* Thereafter, the trial court denied the motion for judgment of acquittal. *See id.* at 87.

Trial Ct. Op. at 6 (record citations omitted). At the conclusion of trial, the jury found Appellant guilty of harassment – communicates repeatedly. Appellant agreed to proceed immediately to sentencing, at which time the trial court imposed a $100 fine.

Appellant filed a timely post-sentence motion. First, she asserted that her conviction violated the First Amendment of the United States Constitution as-applied to the facts and circumstances of her case.[7] **See** Appellant's Post-Sentence Motion and Memorandum of Law, 5/13/22, at 2-4. She argued: (1) she was "convicted solely on the contents of her speech, not by virtue of any physical conduct[;]" and (2) restrictions on free speech are subject to strict scrutiny and have been upheld only when the victim is unable to avoid the speech, so that it becomes an "abusive trespass on one's privacy." **Id.** (citations omitted). Appellant insisted that the evidence proved Victim could have avoided the messages by blocking her on Facebook. **Id.** at 3. Second, in a related claim, she asserted that the jury should have been instructed to consider the following: (1) that the harassment statute does not apply to constitutionally protected activity, and a person may not be convicted for speech that is simply offensive or disagreeable; and (2) whether Victim had the "reasonable ability" to avoid the communication. **Id.** at 6.

_____

[7] Notably, Appellant's argument focused only on a violation of the United States Constitution, and not the Pennsylvania Constitution.

The trial court denied Appellant's post-sentence motion on September 6, 2022. This timely appeal follows.[8]

## II. ISSUES ON APPEAL

Appellant presents the following claims for our review:

I. Did the [trial court] err by denying [Appellant's] Post-Sentence Motion for judgment of acquittal, or vacatur of judgment of sentence, as violating the First Amendment of the U.S. Constitution on its face or as applied to the facts and circumstances of the case?

II. Did the [trial court] err by denying [Appellant's] Post-Sentence Motion for a new trial due to refusal to instruct the jury on constitutionally protected activity under the First Amendment of the U.S. Constitution and under Article I, Section 7 of the Pennsylvania Constitution?

III. Is [the] evidence insufficient as a matter of law for [Appellant's] conviction for harassment under 18 Pa.C.S. § 2709(a)(7)?

Appellant's Brief at 2-3.

## III. CONSTITUTIONALITY OF SECTION 2709(a)(7)

In her first issue, Appellant insists that Subsection (a)(7) of the harassment statute violates both the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution on its face and as-applied to the facts of her case. *See* 18 Pa.C.S. § 2709(a)(7).

---

[8] On October 17, 2022, Appellant complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court then filed a responsive opinion on November 30th.

A challenge to the constitutionality of a criminal statute presents us with "a pure question of law for which our standard of review is *de novo*, and our scope of review is plenary." *Commonwealth v. Collins*, 286 A.3d 767, 775 (Pa. Super. 2022). Our review is guided by the following:

> [A] statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights.
>
> [A] defendant may contest the constitutionality of a statute on its face or as-applied. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

*Commonwealth v. Bradley*, 232 A.3d 747, 756-57 (Pa. Super. 2020) (citation omitted & paragraph break added). "If there is any doubt that a challenger has failed to [demonstrate the] high burden [of establishing the unconstitutionality of a statute], then that doubt must be resolved in favor of finding the statute constitutional." *Collins*, 286 A.3d at 785 (citation omitted).

Here, Appellant challenges the constitutionality of subsection (a)(7) of the harassment statute, which provides, in pertinent part:

> **(a) Offense defined.**—A person commits the crime of harassment when, **with intent to harass, annoy or alarm another**, the person:
>
> \* \* \*

- 10 -

(4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;

(5) communicates repeatedly in an anonymous manner;

(6) communicates repeatedly at extremely inconvenient hours; or

(7) **communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6)**.

\* \* \*

**(f) Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

**"Communicates." Conveys a message without intent of legitimate communication** or address by oral, nonverbal, written or electronic means, including telephone, electronic mail, Internet, facsimile, telex, wireless communication or similar transmission.

18 Pa.C.S. § 2709(a)(4)-(7), (f) (emphases added). Therefore, a person may be convicted of harassment under subsection (a)(7) if, with the intent to harass, annoy or alarm another person, she communicates a message repeatedly without the intent of a legitimate communication. *See* 18 Pa.C.S. § 2709(a)(7), (f).

### (a)   State Constitutional Challenge

As noted *supra*, Appellant challenges the constitutionality of Section 2709(a)(7) under both the United States and Pennsylvania Constitutions. *See* Appellant's Brief at 18-19. We conclude, however, that Appellant has waived her claim under Article I, Section 7 of the Pennsylvania Constitution because

she did not sufficiently articulate a separate state constitution claim before the trial court. As we have repeatedly recognized:

> The Pennsylvania Rules of Appellate Procedure specify that issues that are not first raised in the trial court are waived on appeal. *See* Pa.R.A.P. 302(a). Even issues of constitutional dimension cannot be raised for the first time on appeal.

*Commonwealth v. Strunk*, 953 A.2d 577, 579 (Pa. Super. 2008) (some citations omitted).

Appellant's only reference to the "broader" free speech protections under Article I, § 7 of the Pennsylvania Constitution in the trial court was in the following three paragraphs in her omnibus pretrial motion:

> 15. Article I, Section 7 of the Pennsylvania Constitution's Provisions are broader, and they predate those in the First Amendment of the United States Constitution by roughly 13 years.
>
> 16. Article I draws clear lines around which speech may be civilly actionable while keeping the government out of criminalizing speech, whether written or spoken.
>
> * * *
>
> 18. Article I, Section 7 comes down to the citizens of Pennsylvania from the principles laid out in William Penn's Frame of Government in 1682, and its protections provide a complete and total privilege against prosecution for the writing of political dissidents and other unpopular statements published in the press.

Appellant's Omnibus Pre-trial Motion at 5. Appellant did not provide any argument or case law asserting a state constitutional claim in her brief filed in support of that motion, nor did she present any such claim in her post-sentence motion. **See** Appellant's Brief in Support of Omnibus Pre-Trial Motion, 9/23/21, at 2-7 (unpaginated); Appellant's Post-Sentience Motion and

Memorandum of Law at 2-4 (asserting her conviction "violates the **First Amendment** of the U.S. Constitution as-applied to the facts and circumstances") (some capitalization omitted & emphasis added).

More importantly, Appellant did not identify an Article I, Section 7 challenge in her court-ordered Rule 1925(b) statement. Rather, she argued only that the court erred in denying her post-sentence motion when her conviction was "violative of the **First Amendment of the U.S. Constitution** on its face or as applied to the facts and circumstances of the case." Appellant's Statement of Errors Complained of on Appeal, 10/17/22, at 1 (emphasis added). Consequently, the trial court did not address a distinct state constitutional challenge to the harassment statute in its opinion. Thus, we conclude Appellant has waived her separate challenge to the harassment statute based on the "broader" protections under Article I, Section 7 of the Pennsylvania Constitution.[9] *See Commonwealth v. Armolt*, 294 A.3d 364,

---

[9] Were we to find the issue was preserved in the trial court, we would, nevertheless, conclude Appellant failed to present a cognizable state constitutional claim in her brief on appeal. In *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), the Pennsylvania Supreme Court set forth four factors a litigant should analyze when asserting an independent claim under the Pennsylvania Constitution, including: (1) the text of the provision; (2) the "history of the provision, including Pennsylvania case-law;" (3) related cases from other states; and (4) relevant policy considerations. *Id.* at 895. Although the Supreme Court subsequently explained that a litigant is not required to address all four factors in order to preserve a claim, she must "specifically implicate the Pennsylvania constitution in the claim raised, cite cases in support of the claim, and relate the cases to the claim." *Commonwealth v. Crouse*, 729 A.2d 588, 594 (Pa. Super. 1999), *citing Commonwealth v. White*, 659 A.2d 896, 899 (Pa. 1995).
*(Footnote Continued Next Page)*

379 (Pa. 2023) (holding defendant waived constitutional *ex post* facto claim by failing to include it in Rule 1925(b) statement).

Accordingly, we turn our focus to Appellant's multifaceted argument that Section 2709(a)(7) violates her First Amendment right of free speech both on its face and as-applied to the facts of her case.

### (b)   Facial Constitutional Challenge

Appellant first argues Section 2709(a)(7) is facially overbroad and unconstitutional.  **See** Appellant's Brief at 19.  She maintains that her appeal presents a case of first impression, since the Pennsylvania Supreme Court has not reviewed the constitutionality of Subsection (a)(7).  Appellant's Brief at 20.  Although she recognizes that the Supreme Court rejected a facial constitutional challenge to a prior version of the harassment statute in **Commonwealth v. Hendrickson**, 724 A.2d 315 (Pa. 1999), Appellant insists **Hendrickson** is not controlling here.  She points out that Subsection (a)(7) was not included in the statute the **Hendrickson** Court reviewed, and the

---

Here, Appellant clearly implicated the protections of Article I, Section 7 in her argument.  However, other than emphasizing that our state Constitution provides "broader" protection than our federal Constitution, Appellant fails to relate how this broader protection supports her claim.  **See** Appellant's Brief at 19, 22, 25, 29, 33, 35, 37, 47, 50.  Indeed, her consistent argument throughout the brief is that because Section 2709(a)(7) infringes upon the free speech protections under the First Amendment, it also violates the "broader protections" under the Pennsylvania Constitution. **See id.** at 29, 35, 37, 47, 50.  For this reason, too, we would conclude Appellant's state constitutional claim is waived.

Court relied on "constitutional predicates that are no longer good law[.]" ***See***

***id.*** at 21-23. She maintains that the United States Supreme Court has

clarified that "inherently expressive" conduct is protected by the First

Amendment, and the element "communicates repeatedly" in the current

statute "includes inherently expressive conduct." ***Id.*** at 23-24, *citing*

***Rumsfeld v. Forum for Academic & Institutional Rights, Inc.***, 547 U.S.

47 (2006).

Relying upon a decision of the Third Circuit Court of Appeals, Appellant

argues that "[t]o fall outside the protection of the First Amendment, harassing

speech must be (1) subjectively viewed as such by the victim and (2)

'objectively severe or pervasive enough that a reasonable person would agree

that is it harassment' under the totality of the circumstances." Appellant's

Brief at 24, *citing* ***Saxe v. State College Area School Dist.***, 240 F.3d 200,

205 (3rd Cir. 2001). However, she cautions that when speech or expressive

conduct is protected under the First Amendment, "the subjective intent of the

speaker is irrelevant." Appellant's Brief at 26 (citation & internal quotation

marks omitted). Appellant maintains that because our culture has lost "the

ability to handle provocative criticism[,]" "[h]arassment is now equated with

merely hearing offensive speech[,]" and "persons are becoming convicted of

harassment based on the content, or viewpoint, of the communication,

because it is used to infer intent[.]" ***Id.*** at 27-28. She asserts, however, that

both the content of the communication and intent of the speaker are protected

by the First Amendment. ***Id.*** at 28.

Appellant also insists that we must review the constitutionality of Section 2709(a)(7) pursuant to the strict scrutiny standard because the statute relies on the content of speech to determine harassment. *See* Appellant's Brief at 29-30. She contends that the statute fails strict scrutiny for several reasons: (1) it does not delineate how many times a person must communicate to constitute "too many times[;]" (2) "[t]o 'communicate repeatedly' includes conduct that is 'inherently expressive[;]'" (3) Subsection (a)(7) does not even require a victim, that is, a communication to another person; and (4) Subsection (a)(7) does not require the Commonwealth to prove the communication lacked a "legitimate purpose." *See id.* at 30, 32, 34 (citations & emphasis omitted).

Appellant recognizes that "First Amendment jurisprudence leaves one other avenue [for otherwise protected speech] to survive strict scrutiny" — that is, "when the speaker intrudes on the privacy of the home, or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." Appellant's Brief at 34-35 (emphasis omitted), *citing **Erznoznik v. Jacksonville***, 422 U.S. 205, 209 (1975). Because Section 2709(a)(7) does not require the Commonwealth to demonstrate that the victim/listener is unable to avoid exposure to the offensive speech, Appellant insists the statute is facially overbroad and violates her First Amendment rights.

We begin our analysis with the Supreme Court's decision in **Hendrickson**. In that case, the defendant repeatedly and anonymously faxed documents containing "racial and ethnic statements and derogatory

- 16 -

comments about the medical and legal professions" to "about forty people at their offices." *Hendrickson*, 724 A.2d at 316. In all, the individuals received "about 400 faxes." *Id.* "The recipients testified that the faxes disrupted their offices and invoked emotions of anger and fear." *Id.* at 317. The defendant was subsequently arrested and charged with "multiple counts of harassment by communication or address under 18 Pa.C.S. § 5504(a)(1) and (a)(2)[.]"[10] *Id.* Following his conviction, the defendant filed a direct appeal asserting Section 5504 was "unconstitutionally overbroad and vague in violation of the United States" Constitution.[11] *Id.*

> Former Section 5504 provided as follows:
>
> (a) Offense defined. — A person commits a misdemeanor of the third degree if, with intent to harass another, he:
>
> (1) makes a telephone call without intent of legitimate communication or addresses to or about such other person any lewd, lascivious or indecent words or language or anonymously telephones another person repeatedly; or
>
> (2) makes repeated communications anonymously or at extremely inconvenient hours, or in offensively coarse language.

*Hendrickson*, 724 A.2d at 317, *citing* 18 Pa.C.S. § 5504(a)(1)-(2).

---

[10] Section 5504 was repealed effective February of 2003, and is now encompassed in the harassment (18 Pa.C.S. § 2709(a)(4)-(7)) and stalking (18 Pa.C.S. § 2709.1) statutes. *See Commonwealth v. Collins*, 286 A.3d 767, 776 (Pa. Super. 2022).

[11] As Appellant points out, the defendant also challenged the statute under the Pennsylvania Constitution, but the Court determined that claim was waived. *See Hendrickson*, 724 A.2d at 317 n.1.

In reviewing the constitutionality of the statute, the Supreme Court observed that "[a] statute is overbroad if by its reach it punishes a substantial amount of constitutionally-protected conduct." *Hendrickson*, 724 A.2d at 317-18 (citations omitted). The Court explained, however, that "[t]he function of overbreadth adjudication . . . attenuates as the prohibited behavior moves from pure speech towards conduct, where the conduct falls within the scope of otherwise valid criminal laws that reflect legitimate state interests." *Id.* at 318 (citations omitted).

Upon review of Section 5504, the Supreme Court concluded the statute was not unconstitutionally overbroad:

> [T]he plain language of Section 5504 seeks to regulate **conduct** intended to harass another. The government has a legitimate interest in preventing the harassment of individuals. **The statute is not directed at the content of speech and is unrelated to the suppression of free expression**. Rather, the statute focuses on the **manner and means of communication** and proscribes communications made with an intent to harass. By requiring an intent to harass, the statute does not punish constitutionally-protected conduct and . . . is not facially overbroad in relation to its legitimate purpose.

*Hendrickson*, 724 A.2d at 318 (emphases added).[12]

---

[12] Although Appellant does not raise a vagueness challenge on appeal, we note that the *Hendrickson* Court also determined the statute was not unconstitutionally vague. *See Hendrickson*, 724 A.2d at 319 (holding language of statute, read in context, was sufficiently specific for defendant to understand what was prohibited, and jury's determination that he acted with specific intent undercuts any argument that he did not understand the crime).

As stated **supra**, Appellant first insists that we are not bound by the decision in **Hendrickson** because Subsection (a)(7) was not included in the prior statute. **See** Appellant's Brief at 21-22. Upon our review, however, we conclude that the decision in **Hendrickson** is controlling.

Although Subsection (a)(7) was not specifically included in the former statute, Section 5504 proscribed the same conduct. Section 5504 provided that a person was guilty of harassment by communication if, "with the **intent to harass** another" she, *inter alia*, "[made] a telephone call **without intent of legitimate communication**[;] or [made] **repeated communications** anonymously or at extremely inconvenient hours or in offensively course language." **See** 18 Pa.C.S. § 5504(a)(1)-(2) (emphases added) (repealed). Similarly, Section 2709(a)(7) provides that a person is guilty of harassment "when, with the intent to harass, annoy or alarm another, the person . . . **communicates repeatedly** in a manner other than specified in paragraphs (4), (5), and (6)[,]" which proscribe, respectively, lewd or obscene words or drawings, anonymous communications, and communications at "extremely inconvenient hours[.]" **See** 18 Pa.C.S. § 2709(a)(4)-(7). Moreover, Section 2709(f) defines "[c]ommunicates" as "[c]onvey[ing] a message **without intent of legitimate communication** . . . ." 18 Pa.C.S. § 2709(f) (emphasis added). Therefore, Section 2709(a)(7), like former Section 5504, criminalizes the act of repeatedly communicating a message, without any legitimate intent, for the intended purpose of harassing, alarming or annoying another person.

Accordingly, we conclude, as did the **Hendrickson** Court, that the statute is not unconstitutionally overbroad because it "seeks to regulate **conduct**" and "is not directed at the content of speech [or] the suppression of free expression." **Hendrickson**, 724 A.2d at 318 (emphasis added). Rather, like former Section 5504, Section 2709(a)(7) "is directed at the harassing nature of the communications, which the legislature has a legitimate interest in proscribing." **Id.**

Appellant also contends that **Hendrickson** is not controlling because it "rested on constitutional predicates that are no longer good law based on subsequent precedents by the U.S. Supreme Court and the U.S. Court of Appeals for the Third Circuit." Appellant's Brief at 23. Again, we disagree.[13]

Appellant asserts that more recent federal law regarding "inherently expressive conduct" somehow undermines the decision in **Hendrickson**, and that there is no "categorical harassment exception to the First Amendment's free speech clause." **See** Appellant's Brief at 23-24, *citing* **Rumsfeld**, 547 U.S. at 66; **Saxe**, 240 F.3d at 205. Our review of **Hendrickson**, however, does not reveal any conflict. As noted **supra**, the **Hendrickson** Court relied upon the fact that Section 5504 regulated the "harassing nature of the

---

[13] To the extent Appellant argues that **Hendrickson** should be overruled, we remind her that "[i]t is a fundamental precept of our judicial system that a lower tribunal may not disregard the standards articulated by a higher court." **Commonwealth v. Randolph**, 718 A.2d 1242, 1245 (Pa. 1998). **See also Commonwealth v. Edrington**, 464 A.2d 456, 460 n.3 (Pa. Super. 1983) ("[T]he Superior Court cannot overrule Supreme Court decisions.").

communications" not the messages conveyed. *See Hendrickson*, 724 A.2d at 318. Thus, whether focusing on expressive speech or expressive conduct, Section 2709(a)(7) prohibits the repeated communication of a message, which has no legitimate intent, with the specific purpose of harassing, annoying or alarming another person. *See Rumsfeld*, 547 U.S. at 65-67 (act which denied federal funding to colleges that prohibited or prevented military from recruiting on campus as a result of colleges' disagreement with government's policy on homosexuals in military did not violate right to free speech; "[t]he expressive component of [the] school's actions is not created by the conduct itself but by the speech that accompanies it").

Moreover, Appellant's reliance on *Saxe* is misplaced. She cites the following test to determine whether harassing speech falls outside the protection of the First Amendment: the "harassing speech must be (1) subjectively viewed as such by the victim and (2) 'objectively severe or pervasive enough that a reasonable person would agree that it is harassment' under the totality of the circumstances." Appellant's Brief at 24, *citing Saxe*, 240 F.3d at 205 (citation omitted). However, Appellant fails to describe the context in which the Third Circuit applied this test, which, we conclude, is critical.

In *Saxe*, the Third Circuit Court of Appeals considered whether a school district's anti-harassment policy was unconstitutionally overbroad. The policy proscribed, *inter alia*, "unwelcome verbal, written or physical conduct directed at the particular characteristic[s]" of another with "the purpose or effect of

substantially interfering with the student's education performance or creating" a hostile environment. **See Saxe**, 240 F.3d at 202-03. The **Saxe** Court cited the above test when discussing the concept of "'hostile environment' harassment." **See id.** at 205. Indeed, the quote relied upon by Appellant specifically states that the test is relevant to determine if conduct constitutes harassment under "**a** '**hostile environment**' **theory**[.]" **Id.** (emphasis added).[14] Moreover, in a footnote, the Third Circuit acknowledged that "Pennsylvania's criminal harassment statute" — Section 2709 — "covers a **much narrower range** of conduct than [was] implicated by the" school policy at issue. **Id.** at 204 n.4 (emphasis added). Thus, we conclude the test in **Saxe** is not relevant in the present case. Accordingly, we have neither the authority nor the inclination to overrule **Hendrickson**. **See Randolph**, 718 A.2d at 1245.

Because we conclude the Supreme Court's decision in **Hendrickson** is dispositive of Appellant's facial challenge to Section 2709(c), we need not

---

[14] Appellant fails to acknowledge the **Saxe** Court did **not** create the two-part test — rather, it quoted the United States Supreme Court's decision in **Harris v. Forklift Systems, Inc.**, 510 U.S. 17 (1993). **Harris**, in turn, was not a First Amendment case; rather the **Harris** Court considered the "definition of a discriminatorily 'abusive work environment' (also known as a 'hostile work environment') under Title VII of the Civil Rights Act of 1964[.]" **Id.** at 18-19. Thus, it is inapplicable here.

engage in a prolonged discussion of the remaining arguments in Appellant's first issue. With regard to her call for "strict scrutiny" review,[15] we note:

> [**C**]**ontent-based restrictions** on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. **Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed**.

*S.B. v. S.S.*, 243 A.3d 90, 104–05 (Pa. 2020) (citation & quotation marks omitted; emphases added). Here, Section 2709 does not seek to regulate an individual's speech based on "the topic discussed or the idea or message expressed[;]" rather, it regulates the manner in which a communication is delivered. *See id.*; *Hendrickson*, 724 A.2d at 283 (holding harassment statute "is not directed at the content of speech" but "focuses on the manner and means of communication and proscribes communications made with an intent to harass"). Accordingly, strict scrutiny is not required.

Further, relying upon *Erznoznik*, Appellant also contends that Section 2709(a)(7) is facially unconstitutional because it does not require the Commonwealth to prove the victim/listener was unable to avoid exposure to the offensive speech. *See* Appellant's Brief at 34-35. Again, however, Appellant relies on decisions which are factually dissimilar. The *Erznoznik* Court considered the "facial validity of a [city] ordinance that prohibit[ed] showing films containing nudity by a drive-in movie theater when its screen

---

[15] *See* Appellant's Brief at 29-30.

- 23 -

[was] visible from a public street or place." *Erznoznik*, 422 U.S. at 206. Because the ordinance, on its face, "discriminate[d] among movies solely on the basis of content[,]" the Supreme Court applied strict scrutiny. *See id.* at 209, 211. The Court observed that "selective restrictions [on speech] have been upheld only when the speaker intrudes on the privacy of the home, . . . or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Id.* at 209 (citations & footnote omitted). As discussed above, the statute at issue in the present case is not subject to strict scrutiny because it does not seek to restrict the **content** of speech. Thus, Appellant's facial challenge to Subsection 2709(a)(7) fails.

### (c)   As-Applied Constitutional Challenge

Appellant also presents an as-applied challenge to the constitutionality of the Section 2709(a)(7). She argues that application of the statute under the facts and circumstances of her case violates her First Amendment rights. Appellant's Brief at 37. First, Appellant states that "strict scrutiny must be applied" because her prosecution was "not content-neutral[;]" the contents of her communications were admitted at trial and shown to the jury. *See id.* at 38. She points out that the Commonwealth argued to the jury that the "**messages** were outlandish as a professional veterinarian." *Id.* (emphasis added & record citation omitted). Thus, Appellant suggests the jury was required to consider the "content" of the speech.

Further, Appellant categorizes the private messages as simply her attempt to "communicat[e] a particularized viewpoint to" Victim on a matter of public concern, namely animal abuse and neglect. *Id.* at 39-40. She maintains that the First Amendment protects speech regardless of whether others disapprove "of the ideas expressed[,]" and extends its protection to the use of profanity. *Id.* at 40-41.

With regard to the particular facts of her case, Appellant emphasizes that "the speech in question was a single episode that occurred within one day — August 5, 2020." Appellant's Brief at 42. Moreover, due to Facebook's limit regarding the number of sentences in a message, she insists that "her numerous [p]rivate [m]essages are, in reality, a single communication, made contemporaneously." *Id.* Appellant asserts the Commonwealth did not prove that her communications were "objectively severe or pervasive enough that a reasonable person would agree that it is harassment" in order to pass the *Saxe* test. *See Saxe*, 240 F.3d at 205; Appellant's Brief at 42-43.

Moreover, Appellant argues that "[t]o survive constitutional strict scrutiny as applied . . . the Commonwealth had to prove [Victim] was a captive audience" as set forth in *Erznoznik*. *See* Appellant's Brief at 43-44. She claims that, here, Victim could have avoided the harassment by simply blocking Appellant's private messages — an action he chose not to take. *See id.* at 46. Appellant insists Victim "chose to be harassed." *Id.* at 48 (emphasis omitted).

We begin by reiterating that we are not required to review the harassment statute under strict scrutiny. As explained **supra**, strict scrutiny applies to content-based restrictions on speech — that is when the law "applies to a particular speech because of the topic discussed or the idea or message expressed." **S.B.**, 243 A.3d at 104-05 (citation omitted). Subsection 2709(a)(7) does not regulate speech based on the message expressed, but rather "focuses on the manner and means of communication and proscribes communications made with an intent to harass." **Hendrickson**, 724 A.2d at 283.

Appellant contends, however, that her prosecution was "content-based" because the Commonwealth relied on the content of her communications to argue that her messages were "outlandish" and, in fact, displayed her messages to the jury. **See** Appellant's Brief at 38. She insists: "In order to be content-neutral, basically, the contents of the defendant's communications cannot be admitted into the record or shown to the jury." **Id.** Appellant cites no authority supporting this broad claim, and our research has uncovered none.

In **Hill v. Colorado**, 530 U.S. 703 (2000), the United States Supreme Court considered the constitutionality of a statute that prohibited a person from "speech-related conduct within 100 feet of the entrance to any health care facility." **Id.** at 707. The statute prohibited a person from knowingly approaching within eight feet of another, for the purpose of passing a leaflet,

displaying a sign, or counseling. *Id.* In concluding the statute was content-neutral, the Supreme Court observed:

> It is common in the law to examine the content of a communication to determine the speaker's purpose. Whether a particular statement constitutes a threat, blackmail, an agreement to fix prices, a copyright violation, a public offering of securities, or an offer to sell goods often depends on the precise content of the statement. We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.

*Hill*, 530 U.S. at 721.

Similarly, here, the content of Appellant's messages was relevant for two purposes: (1) to determine if the messages were intended as legitimate communications; and (2) to determine if Appellant's intent was to harass, alarm, or annoy Victim. The statue itself, however, is content-neutral. Appellant was not guilty of harassment simply because Victim disapproved of her messages or did not agree with her allegations of abuse. She was convicted because the jury found she repeatedly sent messages to Victim, for which she had no legitimate purpose, and did so with the intent to harass him.

Appellant's as-applied constitutional challenge under *Erznoznik* fails for the same reason as her facial challenge — the statue is not subject to strict scrutiny. We also note that *Erznoznik* considered an ordinance which purported to protect the privacy interests of the **public** at large. The Court opined:

> The . . . ordinance discriminates among movies solely on the basis of content. Its effect is to deter drive-in theaters from showing movies containing any nudity, however innocent or even

educational. This discrimination cannot be justified as a means of preventing significant intrusions on privacy. **The ordinance seeks only to keep these films from being seen from public streets and places where the offended viewer readily can avert his eyes**. In short, the screen of a drive-in theater is not 'so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it.' Thus, we conclude that the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content.

*Erznoznik*, 422 U.S. at 211-12 (citations & footnote omitted). Conversely, the harassment statute, as-applied to Appellant, does not seek to protect the privacy of the public at large. Rather, it seeks to prevent repeated communications of a non-legitimate nature, made with the specific intent to harass a specific listener. Accordingly, *Erznoznik* is inapplicable.

Lastly, with regard to Appellant's assertion that her communications were not "pervasive enough that a reasonable person would agree that it is harassment[,]" we emphasize that she continues to rely upon a standard set forth in *Saxe*, a decision that applies to hostile environment harassment, and is not applicable here. *See* Appellant's Brief at 43. Accordingly, we conclude Subsection 2709(a)(7) satisfies First Amendment protections both facially and as-applied.

## IV. JURY INSTRUCTIONS

Next, Appellant argues the trial court erred in denying her post-sentence motion for a new trial because the court refused to instruct the jury "on the protections under the First Amendment of the U.S. Constitution." Appellant's

- 28 -

Brief at 51. Specifically, she contends the court should have instructed the jury that, in order to convict Appellant, it was required to determine whether the speech was "objectively severe or pervasive enough that a reasonable person would agree that it is harassment[,]" and whether Victim was a captive audience, such that it was "impractical for [him] to avoid exposure to the offensive speech." **See id.** at 55 (citation omitted).

> Our review of a challenge to the court's jury instructions is well-settled:
>
> [W]e review the charge as a whole to determine if it is fair and complete. The trial court commits an abuse of discretion only when there is an inaccurate statement of the law. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error.

**Commonwealth v. Lake**, 281 A.3d 341, 347 (Pa. Super. 2022) (citation & quotation marks omitted), *appeal denied*, 291 A.3d 333 (Pa. 2023).

First, we observe that Appellant does not specify where in the record she requested the two charges she sets forth in her brief. **See** Appellant's Brief at 55. Although she cites to page 58 in the Reproduced Record, that page corresponds to her post-sentence motion, and not to any proposed jury instructions supplied to the trial court.

Second, as we discussed **supra**, neither the "objectively severe or pervasive enough" test set out in **Saxe**, nor the captive audience requirement pronounced in **Erznoznik**, are applicable under the facts presented here. Thus, there would have been no basis for the trial court to instruct the jury on those concepts.

- 29 -

Third, we note:

> "A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of." Pa.R.A.P. 302(b). Additionally, this Court has held that, in the criminal trial context, the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points.

***Commonwealth v. Sanchez***, 82 A.3d 943, 978 (Pa. 2013) (some citations omitted). Here, as we discuss ***infra***, Appellant's only on-the-record objection to the trial court's charge was that the court did not instruct the jury that her First Amendment right to free speech trumped any statute to the contrary. Consequently, she did not preserve an objection based on the specific instructions she now requests in her brief.

Fourth, we conclude the trial court's instruction was clear and appropriate. With regard to the criminal charge of harassment, the court instructed the jury as follows:

> [Appellant] has been charged with harassment. To find [Appellant] guilty of this offense you must find that each of the following elements has been proved beyond a reasonable doubt.
>
> First, that [Appellant] communicated repeatedly with [Victim]. Now, what do we mean by communicate? To communicate means to convey a message or address and individual by oral, nonverbal, written or electronic means, such as telephone, electronic mail, internet . . . all forms of electronic communication, without intent of a legitimate communication.
>
> And the second element is that [Appellant] did so with the intent to harass, annoy or alarm [Victim]. A person acts intentionally when it is his or her conscious object or purpose to bring about such a result.

So ladies and gentlemen, you have to determine whether the crime of harassment has been committed. Yes, there is free speech and we all know that and recognize that, but this law basically says, for communication, at what point does it become criminal.

N.T. at 154-55.

After the instructions were provided, Appellant's counsel asked for a sidebar, where the following discussion ensued:

[Appellant's counsel]: I know we were talking off the record earlier. So the only other thing that I would ask to be charged on is that the **First Amendment is superior and it overrules any statute to the contrary and that if they find that the speech is protected by the First Amendment, that they cannot convict on the basis of the content of that speech.** I would ask for any instruction to that effect.

[Commonwealth's counsel]: I thoroughly object to that. That is not something that we're here for today. We are here for the charge of harassment.

[Appellant's counsel]: Your Honor, I repeat, again, the — Article 6 of the Constitution said —

[Commonwealth's counsel]: You had adequate time to send proposed instructions to [the trial court].

THE COURT: I think both of you have sort of outlined that. I think it's over to the jury. I like to think I made it clear in my instructions that there is a right of free speech, but it would point to draw the line. I think it's clear so I'm not gonna confuse the issue.

You have an exception. You made your objection timely. You're protected on the record. So just leave it at that. Thank you.

N.T. at 155-56 (emphasis added).

We detect no error or abuse of discretion on the part of the trial court.

The court's instruction focused the jury on Appellant's actions and intent — not

- 31 -

the content of her speech. The court acknowledged that citizens have the right to free speech, but at some point the method or manner of communication can become criminal. Accordingly, Appellant's jury charge challenge fails.

## V.    SUFFICIENCY OF THE EVIDENCE

In her final claim, Appellant argues the evidence was insufficient to support her Section 2709(a)(7) conviction. Our review of a sufficiency claim is well-settled:

> A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review under a *de novo* standard. When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Collins*, 286 A.3d at 773–74 (citations & quotation marks omitted). Moreover, "we may not reweigh the evidence or substitute our own judgment for that of the fact finder." *Commonwealth v. Cox*, 72 A.3d 719, 721 (Pa. Super. 2013) (citations & quotation marks omitted).

As noted above, in order to convict Appellant of harassment under Subsection 2709(a)(7), the Commonwealth was required to prove that she communicated a message repeatedly, without the intent of a legitimate

communication, and with the specific intent to harass, annoy or alarm Victim. **See** 18 Pa.C.S. § 2709(a)(7), (f).

Appellant first insists that she engaged in "constitutionally protected activity" pursuant to Section 2709(e), and therefore her intent to harass Victim is irrelevant. **See** Appellant's Brief at 55-56. She also maintains the record "does not support a reasonable inference of [her] intent to alarm [Victim] based on an e-mail and Facebook private messages within a single day." Appellant's Brief at 56. Appellant emphasizes that there was no physical contact between the two, nor threats of physical harm — "[a]t best, [Victim] subjectively felt threatened by the content of her speech that she was going to have his dogs taken away[.]" **Id.** at 57. Moreover, she contends that she did not act without a legitimate purpose, and, in fact, encouraged Victim to contact **her** attorney. **Id.** at 56.

The trial court concluded the evidence was sufficient to support the verdict based on the following:

> Appellant sent no fewer than ten messages to Victim though a variety of mediums, including text messaging, Facebook messaging, and email. These message were sent despite multiple pleas by Victim that Appellant cease communicating with him. And although Appellant claims that she sent some of the messages out of concern for Victim's dogs, most of the messages consisted of disrespectful, vulgar, or otherwise unprofessional language, and some of the messages contained very personal information about . . . Victim and his wife that had absolutely nothing to do with pets or veterinary care whatsoever. This includes the Facebook messages in which Appellant provided screenshots of Victim's financial information and information regarding traffic violations previously committed by Victim's wife. Appellant herself even conceded that she was "so worked up that [she] used

improper language", and that she was "haughty" and "overreacted" and that she "should have taken a step back and more calmly explained why [Victim and his wife] should have been more concerned.["] Based on all of this evidence, any reasonable juror could easily find that these messages were not sent with a constructive purpose in mind and they were sent for no other purpose than to harass, annoy, or alarm Victim and/or his wife. Therefore, there was ample evidence to support the jury's finding that Appellant had harassed Victim[.]

Trial Ct. Op. at 7-8.

Upon our review, we agree the evidence was sufficient to support the verdict. As discussed *supra*, Appellant was not convicted for engaging in constitutionally protected activity. She was convicted based on her conduct, not the content of her speech.

Moreover, while Appellant attempts to downplay the **repeated** nature of her communications — emphasizing she merely sent one email and several private Facebook messages all within a single day — we conclude the evidence supports the jury's verdict. After their argument in the parking lot, at 5:24 p.m., Appellant sent Victim an unsolicited **text** accusing him of animal abuse. *See* N.T. at 34; Commonwealth's Exhibit 9. About 10 minutes later, she sent Victim a private **Facebook message** informing him she would be reporting him for the alleged mistreatment of his dogs. *See* N.T. at 37; Commonwealth's Exhibit 2. At that point, Victim **explicitly** requested that Appellant end all contact with him. *Id.* Around the same time, Victim received a **Facebook friend request** from Appellant, which he did not accept. *See* N.T. at 36-37.

At approximately 6:20 p.m., Appellant sent Victim an **email** in which she, again, accused Victim and his wife of abusing their dogs, describing them as "inhumane" and "uncaring assholes," and providing the name of her attorney (her father) in case they wanted to sue her. N.T. at 44-45; Commonwealth's Exhibit 8. Despite Victim's earlier explicit plea to stop all contact, at approximately 7:07 p.m., Appellant sent Victim eight successive Facebook messages accusing Victim and his wife of neglecting their dogs, and informing Victim he could block her and contact her attorney.[16] **See** N.T. at 38-39; Commonwealth's Exhibits 2-4. At 7:45 p.m., Victim, again, explicitly requested Appellant to "please stop contacting" him. N.T. at 40; Commonwealth's Exhibit 4.

Rather than cease all communication, Appellant responded that it was "a free world" and Victim could "block" her on Facebook; she also stated "Ouch, this must hurt." N.T. at 40. Appellant then sent Victim pictures of his financial information and his wife's traffic violation — information that had nothing to do with her alleged concern for the safety of Victim's dogs. **See id.** at 40-41; Commonwealth's Exhibits 5, 6. After receiving no response from Victim, Appellant sent another series of messages at 9:54 p.m. which included the names of her lawyers and the comment, "I do not have time for low lifes

---

[16] Appellant claims these messages were, in actuality, one message sent in "blocks of four or five sentences[.]" N.T. at 116. Regardless, Appellant still continued to send messages to Victim with no purpose other than to harass or annoy him.

with broke moral compasses." **See** N.T. at 42; Commonwealth's Exhibit 7. Victim responded by informing Appellant he had contacted the police, and again asked her, for the third time, to "stop." **Id.** Two hours later, at 11:41 p.m., Appellant responded: "We've chatted. I told them everything." N.T. at 42-43; Commonwealth's Exhibit 7.

Although the communications occurred over one evening, Appellant contacted Victim by three different means — text, email and Facebook message — and sent numerous messages **after** Victim twice requested that she stop contacting him. Furthermore, the jury acted within its discretion when it rejected Appellant's claim that she sent the messages for a legitimate purpose, *i.e.*, to alert Victim of her intention to report him for animal neglect. Without any response from Victim, Appellant denigrated him and his wife by quickly resorting to name-calling and sending pictures of unrelated personal information. While this information was public, the jury could reasonably conclude that Appellant's intention had nothing to do with her concern for Victim's pets. Moreover, her repeated messaging of Victim — which regressed into matters irrelevant to the care of his pets — despite his pleas to stop, supports the jury's determination that Appellant acted with the specific intent to harass, annoy or alarm Victim. Accordingly, Appellant's final claim fails.

## VI. CONCLUSION

Therefore, we conclude that Section 2709(a)(7) does not violate Appellant's First Amendment right to free speech either facially or as-applied.

We also reject Appellant's challenges to the trial court's jury instructions and the sufficiency of the evidence supporting her convictions. Consequently, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/20/2023